**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kiosko Multiservicios LLC, | No. CV-26-02389-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Financial Crimes Enforcement Network, et al., | |
| Defendants. | |

Kiosko is a money services business ("MSB") that provides money transfers, money orders, and check-cashing services in Maricopa County. It challenges a Geographic Targeting Order the government issued in March 2026. Before the order, MSBs in Maricopa County were required to collect information and file detailed reports only for customer transactions over $10,000. The order lowered that threshold to $1,000, imposing what Kiosko describes as business-crushing administrative burdens. At this stage, Kiosko has shown it is entitled to temporary relief on its notice-and-comment theory. The TRO is granted, but only as to Kiosko.

## I.   Background

Plaintiff Kiosko Multiservicios LLC is an Arizona company with six retail locations in Maricopa County. (Doc. 1 at 4.) Its customers are mostly local residents without bank accounts who use Kiosko to cash payroll checks, pay rent, and send money to family. (Doc. 1 at 4.) Kiosko is regulated as an MSB and is registered with the Treasury Department's Financial Crimes Enforcement Network ("FinCEN"). (Doc. 1 at 4–5.)

The current dispute revolves around new requirements for Currency Transaction Reports ("CTRs"). CTRs require MSBs to collect a significant amount of information, including the name, address, profession, and Social Security number of the person conducting the transaction, a description of the transaction, the type of identification presented, and the name of the reporting financial institution. (Doc. 1 at 5.) Under ordinary reporting requirements, MSBs must file CTRs for transactions over $10,000. (Doc. 1 at 5.) For transactions over $3,000, MSBs must collect some customer information but generally do not have to report it to the government. (Doc. 1 at 6.) For transactions under $3,000, MSBs are not usually required to collect customer information. (Doc. 1 at 7.)

On March 10, 2026, FinCEN issued the Geographic Targeting Order ("GTO") at issue here. Geographic Targeting Order Imposing Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 91 Fed. Reg. 11456–01 (Mar. 10, 2026). The GTO applies to all MSBs in Arizona's Maricopa, Pima, Santa Cruz, and Yuma counties, as well as regions in Texas, New Mexico, and California. (Doc. 1 at 7–8, 12.) It requires MSBs in those regions to file a CTR for every cash transaction of $1,000 or more. (Doc. 1 at 8.)

The March 2026 GTO expanded on earlier orders aimed at MSBs near the southwest border. (Doc. 1 at 9–11.) In March 2025, FinCEN issued a GTO covering thirty zip codes in Texas and California, requiring MSBs in those zip codes to file CTRs for transactions over $200. (Doc. 1 at 10.) In September 2025, FinCEN expanded that order to include Santa Cruz and Yuma counties and increased the reporting threshold to $1,000. (Doc. 1 at 11.) In March 2026, that GTO was expanded again to include Maricopa County, bringing Kiosko within its purview. The GTO is set to expire in September 2026, but Kiosko notes that FinCEN has twice renewed the earlier GTOs and has given no indication it will not continue doing so. (Doc. 1 at 15.)

FinCEN claims the GTO was issued to "combat illicit finance by drug cartels and other illicit actors along the southwest border." (Doc. 1 at 9.) According to an internal memorandum (Doc. 24-1), FinCEN believes MSBs are vulnerable to money laundering

and money transfers through MSBs are associated with Mexico-based drug cartels (Doc. 1 at 11). The same memorandum also acknowledges "most of the business that MSBs conduct is legitimate and essential" in providing services tailored to people without bank accounts. (Doc. 1 at 11.) FinCEN's memorandum states the GTO is intended to generate leads, identify related subjects in ongoing cases, help identify potential money mules, and provide FinCEN with a snapshot of cash transactions in the covered geographic areas. (Doc. 1 at 11–12.)

Kiosko alleges the lowered reporting requirement threatens its survival. According to Kiosko, it almost never completes transactions of $10,000 or more—so it rarely had to complete CTRs when that was the threshold (Doc. 1 at 7)—but 30% to 45% of its weekly transactions are for $1,000 or more (Doc. 1 at 16). Of Kiosko's 12,001 money transactions in March 2026, 4,066 were for at least $1,000 but less than $10,000. (Doc. 1 at 16.) Before the GTO, a routine Kiosko transaction took one to two minutes. (Doc. 1 at 16.) Now, Kiosko spends roughly ten to eighteen minutes to complete those types of transactions. (Doc. 14 at 5.) In March 2026, Kiosko claims it required between 600 and 850 additional labor hours to complete CTRs for the more-than-4,000 transactions affected by the new GTO. (Doc. 14 at 5.)

Kiosko alleges the GTO has caused customer walkaways and lost transactions, especially during peak periods. (Doc. 1 at 17.) It also alleges it will need to hire and train at least six additional employees (one for each retail location) to collect customer information and prepare CTRs. (Doc. 1 at 17.) As a result, Kiosko expects to close locations or go out of business if the GTO remains in effect, because it cannot afford to hire employees or lose customers. (Doc. 1 at 17–18.) Furthermore, Kiosko alleges the GTO will harm its reputation because customers may view Kiosko as prying into their personal information when banks and MSBs outside the covered geographic areas are not subject to the same requirements. (Doc. 1 at 16.)

Kiosko filed this action the day after the GTO went into effect, seeking declaratory and injunctive relief against FinCEN, the Department of the Treasury, and related federal

officials. (Doc. 1.) It now moves for a temporary restraining order enjoining enforcement of the GTO. (Doc. 14.)

## II. Legal Standard

Generally, a court analyzes a request for a temporary restraining order under two slightly-different tests. First, it must evaluate if there is a likelihood of success on the merits, if there is a likelihood of irreparable harm, whether the balance of equities tips in the movant's favor, and whether an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A court typically must also assess whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

## III. Analysis

Kiosko's complaint alleges claims under the Fourth and Fifth Amendments alongside three different claims under the Administrative Procedure Act ("APA"). Under one APA theory, Kiosko argues the GTO is unlawful because it qualifies as a rule but was issued without following notice-and-comment procedures. Based on the present record and briefing, Kiosko has raised serious questions going to the merits of its notice-and-comment claim, meaning the court need not address the viability of any other claims.

### A. Merits and Serious Questions

Kiosko's first requirement for obtaining relief is establishing either a likelihood of success on the merits or "serious questions going to the merits." *Id.* at 1134. Kiosko's notice-and-comment claim largely depends on what constitutes a "rule" versus an "order" under the APA and which of those categories covers the GTO. Kiosko claims the GTO is a rule that was improperly issued without notice and comment. (Doc. 14 at 13–15.) FinCEN argues Congress specifically authorized it to proceed by "order" in 31 U.S.C. § 5326, and the GTO is a temporary, geographically-limited investigatory measure rather than a rule. (Doc. 24 at 11–12.) The limited record and briefing support Kiosko's view.

- 4 -

The APA, which the parties agree applies to FinCEN's action, draws a distinction between rules and orders. In general, a "rule" is the product of rulemaking, whereas an "order" is the product of adjudication. *See* 5 U.S.C. § 551(4)–(7). Rulemaking promulgates policy-type standards, while adjudication resolves disputed facts in particular cases. *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Essentially, "adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). Adjudications usually have an immediate effect on the specific parties before the agency, while rules are prospective and affect individuals only after they are applied. *Id.* As a result, courts trying to distinguish between rules and orders often ask whether the agency resolved a dispute involving specific parties in a specific case or instead adopted a forward-looking requirement affecting a broad swath of unspecified businesses. *See id.*; *see also Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, 785 F. Supp. 3d 785, 806–07 (S.D. Cal. 2025). The content of an action, not the label the agency applies, guides the analysis; when an agency promulgates what is in substance a rule, the APA requires notice and comment.[1] *See* 5 U.S.C. § 553; *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019); *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1151 (9th Cir. 2008).

The statutory framework regarding CTRs and GTOs reflects this distinction. The Bank Secrecy Act ("BSA") authorizes the Treasury to impose reporting and recordkeeping requirements designed to produce information useful to criminal, tax, regulatory, and national-security investigations. 31 U.S.C. § 5311. Under the BSA, the Treasury may require financial institutions to report currency transactions in an amount prescribed by *regulation*. 31 U.S.C. § 5313(a). Under current federal regulations, the CTR reporting threshold applies only to transactions greater than $10,000. 31 C.F.R. § 1010.311.

---

[1] The APA recognizes several exceptions to notice-and-comment rulemaking. For example, notice and comment is not required for interpretive rules, general statements of policy, rules of agency organization, procedure, or practice, or when the agency finds good cause that notice and comment would be impracticable, unnecessary, or contrary to the public interest. U.S.C. § 553(b)(A)–(B). FinCEN does not invoke the APA's good-cause exception or any other set forth in § 553.

Congress later supplemented the BSA through the Anti-Drug Abuse Act of 1988, allowing the Treasury to impose additional reporting and recordkeeping requirements in areas where drug trafficking or money laundering present particular concerns.[2] 31 U.S.C. § 5326; *see also Novedades*, 785 F. Supp. 3d at 795–96. Upon finding reasonable grounds, the Secretary "may issue an *order* requiring any domestic financial institution . . . or group of domestic financial institutions . . . in a geographic area" to obtain transaction information, maintain records, and file reports. 31 U.S.C. § 5326(a) (emphasis added). Section 5313 authorizes ordinary CTR requirements "by regulation," whereas § 5326 authorizes GTOs "by order." That difference suggests Congress intended GTOs to issue as orders, not regulations. *See Novedades*, 785 F. Supp. 3d at 805–06. But the present factual record and the terms of the GTO at issue bear little resemblance to an "order" under the APA.

One court within the Ninth Circuit has concluded the earlier March 2025 GTO appeared to be a rule, not an order. *Novedades*, 785 F. Supp. 3d at 806–08, 813. That court reasoned that the GTO imposed new recordkeeping and reporting obligations on covered MSBs, did not make individualized factual determinations about whether any particular business was uniquely vulnerable to money laundering, and operated as a broad pre-investigatory tool. *Id.* at 806–08. The court then held the GTO created obligations and changed existing law, making it a rule that required notice and comment. *Id.* at 813. The Western District of Texas reached the same conclusion, reasoning the earlier GTO applied uniformly to MSBs in covered zip codes, created new prospective reporting obligations, carried civil and criminal penalties, and did not result from an adjudicatory proceeding involving the covered MSBs. *Tex. Ass'n of Money Servs. Bus. v. Bondi*, 783 F. Supp. 3d 963, 982–84 (W.D. Tex. 2025). Both cases are now on appeal. *Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, No. 25-4238 (9th Cir. filed July 8, 2025); *Tex. Ass'n of*

---

[2] Following its enactment in 1988, § 5326 was amended several times. Two of those amendments are relevant here. In 1992, a nondisclosure provision was added, which prohibits financial institutions and their employees from disclosing the existence of any GTOs to which they are subject. In 2001, the maximum effective period for GTOs was lengthened from 60 days to 180 days.

*Money Servs. Bus. v. Bondi*, No. 25-50481 (5th Cir. filed June 13, 2025).

There are serious questions whether the current GTO is subject to the same reasoning. The current GTO uses a $1,000 threshold instead of the $200 threshold earlier GTOs applied, but that difference does not materially change the rule-order analysis. This GTO still applies prospectively to all covered MSBs in the targeted counties and zip codes. (Doc. 1 at 7–8, 15.) It still creates a reporting obligation that did not previously exist for transactions between $1,000 and $10,000. (Docs. 1 at 8.) And it is not premised on any particular dispute involving Kiosko, did not make individualized findings about Kiosko or any group of institutions to which it might belong, and did not impose obligations based on a particularized factual determination about Kiosko's business. Instead, it publicly imposes new reporting requirements on a broad class of businesses based solely on geography. And the specified geographic scope covers a total population of nearly ten million people. (Doc. 1 at 12.) These are the hallmarks of rulemaking, not adjudication. *See Yesler*, 37 F.3d at 448; *Gallo v. U.S. Dist. Ct. for Dist. of Ariz.*, 349 F.3d 1169, 1182 (9th Cir. 2003); *see also Novedades*, 785 F. Supp. 3d at 806–08.

FinCEN argues § 5326's language allowing it to issue an order directed to a "group" of businesses "in a geographic area" would be meaningless if it had to identify each covered business or group based on particularized facts. (Doc. 24 at 16–18.) But acknowledging the statute's language does not answer whether this GTO operates as an order under the APA. This GTO was issued publicly, applies automatically to every covered MSB in broad geographic areas, and imposes forward-looking duties backed by civil and criminal penalties. *See Yesler*, 37 F.3d at 448; *Novedades*, 785 F. Supp. 3d at 806–08. It therefore looks—at least as of now—less like an adjudicatory order and more like a policy-type rule of future effect. *See* 5 U.S.C. § 551(4), (6); *Fla. E. Coast Ry.*, 410 U.S. at 245.

If the current GTO qualifies as a rule, the remaining question is whether § 5326's explicit authorization nevertheless allowed FinCEN to bypass notice-and-comment procedures. At this stage, the answer appears to be "no," or at least there is a serious question to which the answer is likely "no." Section 5326 states the Treasury may issue

targeted "orders," but nothing in that statute expressly displaces notice-and-comment requirements if the agency action functions as a legislative rule, as the APA appears to require. *See* 5 U.S.C. § 559 (requiring express language to supersede notice-and-comment procedures). The structure of § 5326 and its implementing regulation further support that conclusion: § 5326(c) includes a nondisclosure provision for entities receiving a GTO, and the regulation provides that an order issued under § 5326 "shall be directed to the Chief Executive Officer" of that entity. 31 C.F.R. § 1010.370(b), (e). Together, those provisions suggest what lawmakers contemplated—both when § 5326(a) was enacted and when it was left unchanged through later amendments—was a targeted order issued directly to specified entities or groups of entities, not a publicly-issued measure imposing broadly-applicable reporting duties on a category of entities that includes thousands of businesses across several states.

FinCEN has not identified any other BSA provision expressly authorizing the Treasury to impose binding legislative rules without notice and comment. Nor has it invoked the APA's ordinary exemptions for interpretive rules, policy statements, procedural rules, or good cause. *See* 5 U.S.C. § 553(b)(A)–(B). And FinCEN has identified no limits to what it claims is the Treasury's authority under § 5326: taking its logic to the extreme, by defining the "geographic area" as the United States, FinCEN could theoretically circumvent the BSA's requirement that reporting obligations be set by regulation entirely (in successive 180-day increments). *See* 31 U.S.C. § 5313(a). That reading would create serious tension between § 5313 and § 5326, and courts generally avoid interpretations that make statutory provisions conflict or render one part of a statutory scheme superfluous. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Taken together, Kiosko has raised serious questions as to whether FinCEN was required to use notice-and-comment rulemaking before issuing the GTO. Because this conclusion is sufficient for purposes of resolving Kiosko's TRO motion, the court need not, and does not, address Kiosko's remaining theories.

### B. Likelihood of Irreparable Harm

Economic harm "is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). But "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). Additionally, when a plaintiff provides "specific evidence that its reputation and goodwill [are] likely to be irreparably harmed," this more-intangible injury may also qualify as irreparable. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 761 (9th Cir. 2018); *see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Kiosko has shown a likelihood of irreparable harm. The GTO requires Kiosko to collect and report detailed personal information for many routine transactions that previously did not trigger federal reporting requirements. (Docs. 1 at 8; 14 at 1–2.) In March 2026, more than 4,000 of Kiosko's transactions were newly subject to those requirements, and Kiosko estimates the added collection and reporting process required between 600 and 850 additional labor hours that month. (Docs. 14 at 5; 26 at 11–12.) Kiosko argues it cannot absorb those added labor costs while maintaining all six locations, and that it may be forced to close most or all of its locations if the GTO remains in effect. (Docs. 14 at 7; 26 at 12.) That is enough to show more than ordinary economic harm.

The record also supports harm to Kiosko's customers and goodwill. Kiosko serves customers who rely on MSBs for everyday transactions such as cashing paychecks, paying rent, and sending money to family. (Doc. 1 at 4.) It claims some customers have declined to complete transactions after learning they must provide additional personal information, and argues others may take their business to banks or MSBs in nearby counties not covered by the GTO. (Doc. 14 at 7–8.) The GTO therefore places Kiosko in the position of asking customers for sensitive information during routine transactions, increasing transaction time, and risking customer frustration during peak periods. (Docs. 14 at 5, 7–8; 26 at 11–12.) Those circumstances are enough to show likely loss of customers and goodwill, which "do[] not readily lend [themselves] to calculable money damages." *Epic Games, Inc. v.*

*Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023). The record is therefore sufficient to show likely irreparable harm absent temporary relief.

### C. Balance of Equities and Public Interest

The court must also "weigh the damage to each [party] in determining the balance of the equities." *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019) (simplified). The "damage to each" is measured as "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. When defendants are federal agencies and officials, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). And when a plaintiff raises serious questions that an agency failed to comply with required APA procedures, the public interest is served by ensuring the agency acts within the bounds set by Congress. *See California v. Azar*, 911 F.3d 558, 581–82 (9th Cir. 2018); *see also Novedades*, 785 F. Supp. 3d at 822.

The situation here favors temporary relief. Without a TRO, Kiosko faces substantial compliance burdens, loss of customers, harm to goodwill, and possible closure of most or all of its locations. FinCEN identifies an important public interest in combating money laundering and cartel activity, but granting temporary relief would not prevent FinCEN from enforcing the ordinary BSA reporting regime or using other lawful tools to generate leads to investigate illicit financial activity. It would merely preserve the pre-GTO status quo while the court considers the matter further. On this record, the likely harm to Kiosko from immediate enforcement and the public interest sharply outweigh FinCEN's interest in enforcing the new reporting threshold before further review. *See California*, 911 F.3d at 581–82; *Novedades*, 785 F. Supp. 3d at 822.

### IV. Relief Granted and Scope

Kiosko has shown it is likely to succeed or has raised serious questions on its notice-and-comment claim, has shown likely irreparable harm, and has shown the balance of equities and public interest favor temporary relief. But the statewide injunction Kiosko requests (Docs. 14 at 20–21; 26 at 13–14) is broader than necessary to provide complete

relief to the plaintiff before the court. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851–52 (2025). Accordingly, defendants are temporarily restrained from enforcing the GTO's requirement that Kiosko file CTRs for cash transactions of $1,000 or more that would not otherwise be reportable under ordinary CTR regulations. The temporary restraining order will expire on May 22, 2026, and the court declines to require a bond.

If Kiosko intends to seek a preliminary injunction, it must file its motion by May 15, 2026. If such a motion is filed, FinCEN's response will be due May 22, 2026, and Kiosko's reply on May 27, 2026. The parties must address the following questions in any preliminary injunction briefing: (1) what do the terms "group of domestic financial institutions" and "geographic area" in 31 U.S.C. § 5326 mean, and do those phrases or any other statutory language impose limits on the Treasury's authority to issue a GTO?; (2) what is the relevance, if any, of 5 U.S.C. § 559 in interpreting 31 U.S.C. § 5326?; (3) in broad terms, when has the Treasury previously issued GTOs and has any previous GTO ever affected a comparable number of financial entities? With respect to Kiosko's claim that FinCEN has violated the APA because the GTO is arbitrary and capricious, the parties must also discuss the factual basis for extending the GTO to cover Maricopa County, which is not "along the southwest border" (Doc. 24-1 at 2), and provide unredacted copies—under seal and subject to a protective order, if necessary—for all portions of the February 26 Information Memorandum pertaining to Maricopa County. Both parties shall also indicate their view on whether there are any contested facts bearing on the issuance of a preliminary injunction such that an evidentiary hearing should be held. A hearing on any motion for preliminary injunction will be held on June 1, 2026, and will consist of oral argument if no further evidentiary development is needed.

/

/

/

/

/

**IT IS ORDERED** the Motion for Temporary Restraining Order (Doc. 14) is **GRANTED**.

**IT IS FURTHER ORDERED** defendants are temporarily restrained from requiring Kiosko to file CTRs under the March 2026 GTO for transactions of $1,000 or more that would not otherwise be reportable under existing CTR regulations.

Dated this 8th day of May, 2026.

_____
**Honorable Krissa M. Lanham**
**United States District Judge**

- 12 -