Jose A. Saldivar #022991
Maria David # 036176
**Saldivar & Associates, PLLC**
2417 N. 24th Street
PHOENIX, ARIZONA 85008
602-314-1340 telephone
602-354-3098 facsimile
jose@saldivarlaw.com
maria@saldivarlaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kiosko Multiservicios LLC;<br><br>Plaintiff,<br><br>vs.<br><br>Financial Crimes Enforcement Network; Andrea Gacki, in her official capacity as Director of Financial Crimes Enforcement Network; U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; and Todd Blanche, in his official capacity as the Acting Attorney General of the United States,<br><br>Defendants. | No. 2:26-cv-02389-KML<br><br>**PLAINTIFF'S MOTION FOR A PRELIMINARY INNUNCTION**<br><br>**EVIDENTIARY HEARING REQUESTED** |

Pursuant to Fed. R. Civ. P. 65(a), Plaintiff Kiosko Multiservicios LLC ("Kiosko") hereby applies for a preliminary injunction enjoining Defendants from enforcing FinCEN's geographic targeting order for certain counties and zip codes near the U.S.-Mexican border. *See* 91 Fed. Reg. 11456 (Mar. 10, 2026) (the "GTO" or "Border GTO").

1

## I.    Introduction

This Court entered a Temporary Restraining Order on May 8, 2026, enjoining enforcement of the GTO against Plaintiff. Plaintiff now seeks a preliminary injunction. Plaintiff has compelling evidence that will enable the Court to understand how irrational the $1,000 GTO is. The GTO imposes business crushing burdens upon Money Services Businesses ("MSBs") like Kiosko, while simultaneously failing to achieve its stated purpose of "identify[ing] illicit actors." Doc. 24-1 at 2. This destructive, unprecedented, illegal, and unconstitutional GTO should be preliminarily enjoined.

## II.    Factual Background

### i.    *Plaintiff Performs Simple Transactions for Hardworking People.*

Plaintiff Kiosko is a MSB with 6 retail locations in Phoenix, Arizona. Exhibit 1 ¶¶ 4-5. Kiosko has been in business since 2016 and it provides money transfers, money orders, and check cashing services to regular people, many of whom are low income and do not use banks. *Id.* ¶¶ 5-6, 17-20. Many customers use Kiosko's services to cash paychecks, pay rent, and send money to family, all of which is perfectly legal and is an essential service for the people who rely upon in. *Id.* ¶¶ 17-20. Kiosko is registered with FinCEN as an MSB. *Id.* at ¶ 4.

### ii.    *FinCEN Drops the Threshold for Currency Transaction Reports from $10,000 to $1,000 in Targeted Locations.*

All MSBs throughout the country are required to submit CTRs for transactions over $10,000. 31 C.F.R. § 1010.311. The CTR form requires detailed information on the entity facilitating the transaction, the form the currency takes, and each person involved must provide their full legal name, age, gender, address, phone number, address, social security number (or other taxpayer identification number), specific occupation (from a dropdown list), the number from a valid driver's license (or passport or alien registration card), amounts of money, and bank account numbers that transmit or receive the money. Doc 14-1 at Exhibit 2. FinCEN has estimated that each CTR takes eight minutes to

complete, but for a non-bank filer like Kiosko, FinCEN estimates each CTR takes 23.93 minutes to complete. 89 Fed. Reg. 7,767, 768 (Feb. 5, 2024); 85 Fed. Reg. 29,022, 29,029 (May 14, 2020).

Willful violations carry a per-violation penalty of over $70,000, as well as criminal penalties of up to five years in prison. 31 U.S.C. § 5321(a)(1); 31 C.F.R. § 1010.821. Even negligent violations carry per-violation penalties of $1,400. 31 U.S.C. § 5321(a)(6)(A); 31 C.F.R. § 1010.821.

iii.     *The Memorandum Supplied by FinCEN Contains No Evidence That the GTO Will Achieve Any Law Enforcement Goal.*

FinCEN justifies the GTO as part of "Treasury's efforts to combat illicit finance by drug cartels." 91 Fed. Reg. at 11456. In support of its opposition to the TRO, the government filed a memorandum prepared by FinCEN. Doc. 24-1. Notably the Memorandum is not the result of notice-and-comment rulemaking or an adjudication in which non-FinCEN parties were able to contribute evidence. The sources are reports and news articles that FinCEN itself cherrypicked as part of its internal process (and which have not been provided to Plaintiff). Nothing in the Memorandum reveals evidence about what fraction of MSB transactions over $1,000 are illicit.

- "In the six-month period…prior to issuance of the initial SWB GTO…MSBs in just 23 southwest border counties—0.7 percent of all counties—filed almost five percent of all CTRs." Doc. 24-1 at 9. No discussion of legitimate versus illegitimate transactions. There is also no context relative to population size. Maricopa County is the most populous county in Arizona at over 4 million people, and among the most populous counties in the United States. It necessarily follows that areas with larger populations will have a higher volume of financial transactions. Figure 8 of the Memo confirms this. Other areas with the highest numbers of CTRs largely correspond to the most populous areas, including those counties

containing New York City, Los Angeles, Chicago, Dallas, and Miami.

- "FinCEN analyzed 1,246 BSA reports that identified suspected fentanyl-related activity filed by financial institutions." *Id.* at 8. No discussion of what portion of these reports were filed by MSBs as opposed to other financial institutions.

- "Money mules allow cartels to structure cash transactions at MSBs to evade recordkeeping and reporting requirements." *Id.* at 11-12. No discussion of what fraction of MSB transactions involve money mules or structuring.

- The Memo identifies two criminal cases involving MSBs (from outside the targeted counties and zip codes) whose owners were active conspirators. *Id.* at 14 & n. 47.

The Memo asserts that dropping the CTR threshold to $1,000 will enable "targeted investigations of supplies and facilitators that enable the flow of deadly drugs, such as fentanyl, into the United States." *Id.* at 17. But FinCEN cites no evidence for this. If the GTO were meaningfully advancing law enforcement objectives, the government would surely highlight at least some enforcement outcomes from the over 700,000 CTRs filed under the prior GTOs. *Id.* at 24. In the 1990s, the government proudly toted demonstratable law enforcement outcomes of GTOs, including the successful prosecution of numerous agents and employees of money remitters in New York and the dramatic reduction in the flow of narcotics proceeds.[1] Not so here. The government has not provided evidence indictments, prosecutions, or reduction in flow of fentanyl precursors or proceeds.

---

[1] Treasury Acts Against Flow of Dirty Money To Colombia (Dec. 23, 1996), https://www.fincen.gov/news/news-releases/treasury-acts-against-flow-dirty-money-colombia.

     *iv.     FinCEN provides minimal factual basis for the expansion of the GTO.*

To say that FinCEN provides minimal justification for expanding the GTO to cover Maricopa County is generous. *See* Doc. 24-1 at 19-21. The Memo asserts that there are "significant cases of illicit MSB activity" in Maricopa County, but fails to identify even a *single* instance of illicit MSB activity in Maricopa County, let alone what proportion of MSB activity is legal versus illegal. *Id.* at 22.

FinCEN states, "[b]ased on law enforcement request, GID proposes that the SWB GTO expand to Pima and Maricopa Counties in Arizona, which contains the cities of Tucson and Phoenix respectively. Of note, Pima and Maricopa Counties are part of a designed High Intensity Drug Trafficking Areas." *Id.* at 19. The government does not assert any instances of indictments or successful prosecutions of corrupt MSBs or their owners in Maricopa County. The government asserts that HSI Nogales requested expansion of the GTO to cover Phoenix, but redacts the request. *Id.* at 20. The government points to the Nogales and San Luis border crossings as "key drug trafficking plazas" controlled by the Sinaloa Cartel and the Jalisco New Generation Cartel, but neither of those border crossings are in Maricopa County. *Id.* Maricopa County does not border Mexico and does not have any border crossings at all.

     *v.     The Memorandum Ignores the GTOs Destructive Impact on the "Legitimate and Essential" Work of MSBs by Dropping the Threshold to $1,000.*

FinCEN set the $1,000 threshold because it would "include the cash transactions most vulnerable to abuse by drug cartels through structuring payments to avoid CTRs." *Id.* at 24. Yet FinCEN also recognizes that "much of the business that MSBs conduct is legitimate and essential." *Id.* at 5. The government then handwaves away the crippling impact on MSBs by blithely stating that:

> The vast majority of reports submitted under the SWB GTO
> are being submitted by large, sophisticated companies that are
> likely well-situated to implement the terms of the SWB GTO

> without significant burden or disruption to their operations. Of the remaining MSBs, roughly 20 MSBs have faced a *de minimis* burden. GID has limited information on precisely how the other MSBs have been impacted, but assesses that the burden for most of these MSBs likely varies depending on the sophistication of their operations and the number of reports they have been required to file, with manageable burden.

*Id.* at 25.

This analysis is misplaced. Claims the burden is "*de minimis*" or "manageable" are speculative at best. There was no evidence presented by any non-FinCEN parties—the businesses that bear the compliance burden—about the impact on their operations. There is no indication that FinCEN has considered the frontline burden MSBs bear collecting customer information for a CTR when the CTR is ultimately filed by the money transmitter. Exhibit 1 ¶¶ 10-11; Exhibits 6-7. MSBs such as Kiosko face increased transaction times even when the money transmitter files the CTR, a burden that is not captured by filing metrics.

Plaintiff's declarations of MSB witnesses in Maricopa County establish:

- "The operational burden imposed by the GTO has required and continues to require substantial additional staffing, employee training, compliance oversight, and payroll expenses." Exhibit 2 (costing EZ Check Cashing, Inc., a MSB with 6 locations in Maricopa County, between $39,000 to $49,000 per month for additional employees).

- Increased transaction time causes customers to leave without completing transactions, resulting in the loss or revenue and goodwill. Exhibits 2-7. Six different owners of MSBs in Maricopa County have expressed concerns about the viability of their businesses if the GTO remains in effect. *Id.*

- Kiosko itself will be required to close all but one or two of its stores, if does not go out of business. Exhibit 1 ¶ 45. Kiosko experienced a 20% decline in transactions and has lost at least 500 customers prior to the TRO. *Id.* at ¶¶ 14, 25.

### III.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). The Ninth Circuit "use[s] a 'sliding scale' approach…[s]o, when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only serious questions going to the merits." *hiQLabs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) (cleaned up).

### IV.    Argument

A preliminary injunction is warranted. Plaintiff suffers irreparable economic and constitutional harms from the chaos that the GTO is inflicting on law-abiding businesses. The GTO also violates the Fourth Amendment, the Administrative Procedure Act, and is *ultra vires*. Under the Ninth Circuit's sliding scale, a preliminary injunction should issue to maintain the status quo by preventing FinCEN from enforcing the GTO until a final resolution on the merits.

### A. Plaintiff Faces Irreparable Harms Because the Border GTO Will Destroy Its Business and Invade Its Privacy

Kiosko will suffer irreparable economic harm. Kiosko has already lost at least 500 customers and 20% of its transactions. Exhibit 1 ¶¶ 14, 24-25, and 44. Some customers said they went elsewhere (such as to banks) that does not ask for intrusive personal information about everyday transactions. *Id.* at ¶ 25. A number of MSBs, including Kiosko, have all reported lost customers from increased transaction times. *Id.*; Exhibits 2-7. And, what customers Kiosko retains, compliance with the Border GTO requires substantial additional labor costs that Kiosko cannot absorb without either raising

prices—thereby losing more customers—or operating at a loss. Exhibit 1 at ¶ 25. Either way, the increased compliance burden will force Kiosko to close all but one or two of its six locations, if it can even stay open at all, drastically reducing revenue and eliminating the sole source of income for its owner, Andrea Ruiz. *Id.* ¶¶ 44-45. These harms—loss of customers, goodwill, and the viability of a small business—are quintessentially irreparable.

Plaintiff now has transaction numbers for April 2026, which show that Kiosko has suffered a 20% decline in transaction volume. *Id.* at ¶ 14. Plaintiff had 9,502 transactions in April 2026, a decline from 12,001 transactions in March 2026. *Id.* Of those transactions in April 2026, 2,147 of them (22.6%) were for $1,000 or more, and of those, only 163 transactions were for more than $3,000. *Id.* Despite the decline in business volume, the CTR-related workload remained extremely high. *Id.* The April figures reflect the cumulative effects of pre-TRO compliance upon Kiosko. *Id.* Kiosko fell behind because existing personnel must collect additional customer information, verify documentation, and complete or transmit CTR reports. *Id.* Delays remained ongoing in April 2026, and the decrease in transaction volume evidences the lost customers, loss of goodwill, and financial harm to Kiosko. *Id.* For a low margin, high volume business, this decrease in transactions is substantial, and these effects will continue to compound. *Id.* at ¶ 44. Kiosko lost at least 500 customers—customers who may never return. *Id.* ¶¶ 25, 53. Kiosko's transactions typically take 1-2 minutes per transaction. *Id.* at ¶ 16. Compliance with the GTO increased transaction time to 10 to 18 minutes of additional time per transaction, which compounds over hundreds of covered transactions per week adding hours of delay. *Id.* at ¶ 15. Some of Kiosko's customers have already moved their transactions to banks. *Id.* at ¶ 25. Kiosko is not the only business impacted. Other small MSBs in Maricopa County not covered by the TRO are experiencing business crushing burdens that require them to cut operations and even risk closure. Exhibits 2-7.

Kiosko now needs to pay for an additional 549-754 labor hours per month (and this decline in additional labor hours compared to March 2026 is attributable to the loss of business, an overall harm), paying employees $17.50 to $21.00 per hour. Exhibit 1 ¶¶ 27-28. This labor burden is significant and crippling. It is a cost Kiosko simply cannot afford while maintaining six locations. *Id.* ¶¶ 44-45. Kiosko is not a large institution that already uses software. According to FinCEN's own estimates, a non-bank filer takes 23.93 minutes to complete a CTR. 85 Fed. Reg. 29,022, 29,029 (May 14, 2020). Kiosko's estimates, 15-18 minutes for a CTR filed by Kiosko or 10-15 minutes to collect and send the information to the money transmitter, are well below FinCEN's estimate of 23.93 minutes. While Kiosko was already required to collect customer information for transactions of $3,000 or more, collecting that information for transactions of $1,000 to $3,000 is a substantial new burden. Of the 2,147 transactions that were for $1,000 or more in April 2026, only 163 were for $3,000 or more. *Id.* at ¶ 14. While approximately 22.6% of Kiosko's April 2026 transactions were for $1,000 or more, only 1.7% are for $3,000 or more. The GTO imposes data collection requirements on nearly all of Kiosko's over-$1,000 transactions that did not previously exist.

Monetary losses are irreparable where, as here, "sovereign immunity likely would bar [the plaintiff] from recovering monetary damages incurred during the course of the litigation." *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). Other irreparable economic harms include "threatened loss of prospective customers or good will," *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2011), as well as "loss of control over business reputation," *Adidas Am., Inc. v. Sketchers US, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018). Plaintiff faces those harms as Plaintiff's customers can patronize banks or MSBs in adjacent counties not subject to the GTO. Exhibit 1 ¶ 44. Plaintiff and other MSBs in Maricopa County are suffering a loss of reputation and goodwill. *See id.* ¶¶ 18, 24; Exhibits 2-7.

Irreparable harm also "follows inexorably from [a] conclusion that the government's current policies are likely unconstitutional" under the Fourth Amendment. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). In addition, the loss of financial privacy is irreparable harm because, once information is reported to FinCEN, disclosure cannot be undone. *See, e.g. Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044-1045 (9th Cir. 2012) (loss of privacy resulted in "irreparable harm").

## B. Plaintiff Is Likely to Prevail On the Merits of Their Claims

Under the Ninth Circuit's sliding scale, Plaintiff needs identify only "serious questions going to the merits because the irreparable harms detailed above are so severe. "Serious questions are ones that cannot be resolved one way or the other at the hearings on the injunction because they require more deliberative investigation." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (cleaned up). "They need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (cleaned up). Regardless of whether the Court views the claims through the "serious questions" or "likelihood of success" lens, Plaintiff can show what it needs to.

### i.    *The GTO Likely Violates the Fourth Amendment*

The GTO is a drastic form of surveillance that functions as a "reviled 'general warrant'…which allowed…an unrestrained search for evidence of criminal activity. *Riley v. California*, 573 U.S. 373, 403 (2014); *see also Snitko v. United States*, 90 F.4th 1250, 1262 (9th Cir. 2024) (invalidating "inventory" search that amounted to a general warrant). Requiring a CTR for every transaction over $1,000 covers a substantial percentage of Kiosko's customers. Exhibit 1 ¶ 14. FinCEN is thus treating large numbers of customers as potential criminals. This turns the rules of ordinary criminal investigation on their head. Normally, the government obtains personal information via a warrant supported by probable cause. Here, by contrast, FinCEN has issued a general warrant that applies to everyone so it can go on fishing expeditions.

Under the Fourth Amendment, a financial reporting requirement must be reasonable. This follows directly from the Supreme Court's decision upholding the $10,000 reporting requirement in *California Bankers Ass'n v. Schultz*, 416 U.S. 21 (1974). *Schultz* held that the key Fourth Amendment question was whether the reporting requirement was "reasonable," including whether the "information is sufficiently described and limited in nature." *Id.* at 67. The Court focused on the $10,000 threshold (equivalent to over $60,000 today). That very high threshold limited reporting to "abnormally large transactions in currency," and hence was "reasonable" because it intruded on few transactions. *Id.*; *see also id.* at 78 (Powell, J. concurring) (specifically citing $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions"). Here the $1,000 GTO (about $150 in 1974) intrudes on a substantial minority of transactions (33%-45%), obliterating financial privacy. That is not reasonable. *Schultz* would have come out differently had the Supreme Court faced a reporting threshold of $150.

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the primary authority in *Schultz*, is also instructive. The Court in *Morton Salt* upheld an agency order directing twenty companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. *Id.* at 634-35. The Court upheld the reporting requirement on the ground that it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651-652. The Court underscored that "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Id.* at 652. The $1,000 GTO is precisely the kind of "sweeping" requirement *Morton Salt* condemned.

The Costs imposed by the GTO also amount to an "undue burden." *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (holding, under the Fourth Amendment, that a subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). A small business like Kiosko will have to spend hundreds more hours per month. Prior to the TRO, Kiosko was falling behind.

The Border GTO also likely violates the Fourth Amendment because it is neither uniform across the country (as in *Schultz*) nor applied to businesses in an ongoing agency adjudication (as in *Morton Salt*). This matters because the Fourth Amendment guards against abuses of freewheeling investigatory discretion. *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1064 (9th Cir. 2013) (scrutinizing hotel records), *aff'd* 576 U.S. 409 (2015). Yet, without notice and comment or an administrative adjudication against specific parties, FinCEN claims authority to issue a GTO requiring businesses in any geographic area to report any information that FinCEN deems necessary to carry out the purposes of the banking laws, 31 U.S.C. § 5326(a), even if those businesses are not the subject of investigation based on any individualized suspicion. FinCEN's basic stance toward MSBs and their customers—everyone is a potential criminal—is not only inherently antithetical to the Fourth Amendment, it also poses an unacceptable risk that a GTO will "be used as a pretext to harass [businesses] and their [customers]." *Patel*, 576 U.S. at 421.

In that regard, the sweeping GTO puts this case on all fours with *Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467, 472, 474-75 (S.D.N.Y. 2019), which granted a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." The Court in *Airbnb* analogized the bulk reporting requirement to a vastly overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without any need for individualized suspicion. *Id.*

at 491. Also unlike with a typical subpoena there was no procedure for pre-compliance review. *Id.* at 493. The *Airbnb* court explained that, historically, "[a]n attempt…to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment." *Id.* at 494. So too here.

  ii.  <u>The Border GTO Likely Violates the Administrative Procedure Act</u>

Typically, when an agency action imposing new rules is challenged under the APA, a reviewing court looks to comments in the administrative record that were compiled as part of the notice-and-comment requirement for rulemaking. The court then examines whether the agency adequately considered and addressed legitimate concerns. Here, however, FinCEN impermissibly failed to follow notice-and-comment procedures. And, in part because of this failure, FinCEN failed to consider important questions going to the scope and validity of the GTO, rendering it arbitrary and capricious.

  **a.  The failure to do Notice and Comment is fatal to the GTO.**

The Border GTO is invalid because FinCEN did not go through the notice and comment process required for substantive rules. The APA defines a "rule" as "the whole or part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). A rule "create[s] rights, impose[s] obligations, or effect[s] a change in existing law." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087-1088 (9th Cir. 2009). For instance, in *Safari Club International v. Zinke*, 878 F.3d 316, 320 (D.C. Cir. 2017), an agency made a "determination" that importing elephant ivory from Zimbabwe was banned because it would not "enhance the survival of the species." That "determination" qualified as a rule because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." *Id.* at 333.

When determining the legal significance of an agency's action, courts look to the contents of the action, not the label the agency applies to it. *Azar v. Allina Health*

*Services*, 587 U.S. 566, 575 (2019). The difference between a rule and an order, then, is whether the proceedings were to promulgate policy-type rules or standards (a rule) or to adjudicate disputed facts in a particular case (an order). *See United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973).

Here, the Border GTO is plainly a "rule." MSBs in targeted areas in four states now have a new obligation to process CTRs for transactions of $1,000 or more that did not exist previously. Failure to comply can result in significant civil or criminal penalties. 91 Fed. Reg. at 11457. FinCEN did not adjudicate a dispute between specific parties.

The GTO is not an "order" outside the rulemaking requirement. An "order" is the result of an "adjudication." 5 U.S.C. § 551(7). "Two principal characteristics distinguish rulemaking from adjudication." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "First, adjudication resolves disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Id.*; *Fla E. Coast Ry. Co.*, 410 U.S. at 245 (rulemaking involves "proceedings for the purpose of promulgating policy-type rules of standards" and an adjudication involves "proceedings designed to adjudicate disputed facts in particular cases."). "Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute)." *Yessler*, 37 F.3d at 448. The GTO is a rule because it does not address the rights of specific individuals involved in a specific adjudication. It does not address a concrete dispute and it does affect the rights of "broad classes of unspecified individuals."

The fact that the "O" in GTO stands for "Order" is immaterial. The statute authorizes FinCEN to act via "order." *See* 31 U.S.C. § 5326(a). But, legally, the GTO is a "rule" under the APA. The only way to harmonize the statute and the APA is to read Section 5326(a)'s use of the word "order" as identical to the term "order" in the APA. This means that FinCEN may issue such orders only as part of an adjudication with specific parties, not as it did here, imposing new obligations on entire counties. The fact

that the GTO is a "rule," and not an "order" means that the GTO not only violates the APA, but also exceeds FinCEN's authority under Section 5326(a), making it *ultra vires*.

### b.  5 U.S.C. § 559 is inapplicable here.

5 U.S.C. § 559 provides, in part, "[s]ubsequent statutes may not be held to supersede or modify this subchapter…except to the extent it does so expressly." The government has conceded that the term "order" as used in § 5326 is the term "order" as used in the APA. Doc. 24 at 11 ("But the challenged agency action is an order, not a rule" and discussing the definition of "order" under the APA). All the constraints of the APA should therefore follow, including 5 U.S.C. § 553 which proscribes the notice-and-comment procedure required for rulemaking.

### c.  The Border GTO is arbitrary and capricious.

Had FinCEN done notice and comment, it may have realized that a $1,000 GTO would be a disaster for MSBs, drastically impair their ability to function, drive customers to non-targeted counties or banks, and therefore fail entirely in its goal of gaining insight into cartel money laundering in low-dollar amounts. But instead of doing that required notice and comment, FinCEN is issuing successively broadening GTOs without considering the real-world effects of this unprecedented and unconstitutional financial surveillance. That has resulted in an arbitrary and capricious agency action.

"[T]he touchstone of arbitrary and capricious review is reasoned decisionmaking." *Alterra Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (internal quotation omitted). An "agency rule" is "arbitrary and capricious if the agency has…entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In *East Bay Sanctuary Covenant v. Garland*, the Ninth Circuit invalidated as arbitrary and capricious a Department of Justice and Department of Homeland

Security rule that "denie[d] asylum to aliens arriving at our border with Mexico unless they have first applied for, and have been denied, asylum in Mexico or another country through which they have traveled." 994 F.3d. 962, 968 (2020). The Court found the rule arbitrary and capricious because of its dubious underlying assumptions and its failure to consider serious collateral effects. *Id.* at 980.

The glaring defects in the GTO may be summarized as follows:

(1)     **The scope of the problem:** FinCEN's Memorandum contains nothing about how frequently money laundering occurs at MSBs. Is it one in every 100,000 transactions? More? Less? Whether a drastic reduction in the reporting threshold is a "reasoned" solution depends on the size and nature of the problem.

(2)     **$1,000 is arbitrary:** FinCEN adjusted the threshold to $1,000 to "strike a more appropriate balance." Doc. 24-1 at 24. $1,000 represents everyday transactions such as cashing paychecks or paying rent, thereby capturing a significant of *legal* transactions. Dropping the threshold significantly from $10,000 to $1,000 and subjecting a substantial minority of people to invasive surveillance is irrational and paranoid. A reasoned approach would have begun with an incremental, not a drastic, change. And why is there no discussion of actual instances of MSB related cartel activity below $10,000? A rational starting point would be based upon amounts involved in illicit transactions—but the government does not provide any information about what those thresholds are—is it $1,000? $3,000? $9,999? Something else? As the agency itself initially noted in 1989, if GTOs are not confidential, won't criminals simply change their behavior[2]?

(3)     **The location selection, including Maricopa County, is arbitrary:** No evidence supports the conclusion that Maricopa County has "significant cases of illicit MSB activity." Doc. 24-1 at 22. The government does not cite to *any* instances of illicit MSB activity in Maricopa County, but generally provides aggregate numbers of BSA

---

[2] 54 Fed. Reg. 33675, 33678 (Aug. 16, 1989).

reports by financial institutions. *Id.* at 8. FinCEN does not connect these reports to MSBs. 10-19 BSA reports in Maricopa County (*id.*), which has one of the largest populations by county in the country at over 4 million people, is not even objectively that large after accounting for population. Areas not along the southwest border, like Miami, Seattle, and New York (and areas surrounding them), all have more (20-110) BSA reports. *Id.* Why is Maricopa County being targeted but not those counties containing even more reports? A handful of BSA reports in Maricopa County is not a reasoned basis for targeting MSBs that are not even involved in those transactions. Similarly, FinCEN cites fentanyl seizure incidents along the southwest border in 2024. *Id.* at 7 Figure 14. But merely citing to amounts of fentanyl seizures does not lead to the conclusion that MSBs were involved. FinCEN has simply piled supposition on supposition to target these neighborhoods and businesses. If the two prior iterations of the GTOs which generated over 700,000 CTRs aren't leading to prosecutions or reduction in illicit activity, what reasoned basis can there be for expanding to Maricopa County?

(4)    **No consideration of cartel countermeasures:** Cartel members can drive a short distance past Kiosko to an MSB not in a targeted county. Or go to Nevada, Utah, or Colorado. Or use other laundering techniques such as bulk cash smuggling, China-based money launderers, or cryptocurrency.[3] The GTO will crush law-abiding businesses and will do nothing to gain intelligence about cartel members, who will easily change tactics.

(5)    **No capacity to act on the CTR:** To find more needles, FinCEN is exponentially increasing the size of the haystack. But does FinCEN have the capacity to turn millions of new CTRs into actionable leads and real prosecutions? FinCEN has no demonstrable law enforcement outcomes from the over-700,000 CTRs filed under the

---

[3] *Id.* at n. 28; Order Granting Plaintiff's Motion for Preliminary Injunction, *Texas Ass'n of Money Services Business v. Bondi*, No. SA-25-CA-00344-FB (W.D. Tex. May 19, 2025).

two prior iterations. There is no reason to think expanding to Maricopa County will produce a different result.

(6)    **FinCEN ignored the destructive impact on legitimate businesses:** The declarations establish FinCEN's wholesale failure to consider the GTO's impact on legitimate businesses. FinCEN handwaves away the burden on MSBs and terms them *de minimus* or manageable without any real support in its Memorandum, but it also did not give affected MSBs an opportunity to submit evidence by circumventing notice-and-comment procedure. Kiosko and at least six other small MSBs in Maricopa County all face business crushing burdens and a real possibility of being put out of business entirely. Exhibits 1-7. MSBs face crippling civil and criminal penalties for failing to comply with the GTO, including fines over $70,000 and prison time per violation. Each CTR that isn't filed on time is a potential violation, and MSBs like Kiosko are falling behind. Even penalties for negligent violations can quickly mount. MSBs have had reduced business and lost customers. Exhibits 1-7. Many, like Kiosko, may not survive.

### d. *The Border GTO is* ultra vires *because is not sufficiently authorized by statute.*

The Border GTO is also ultra vires because it exceeds the agency's authority under Section 5326(a). That statute contemplates limited information-gathering requirements directed a particular businesses (or groups of businesses) in the context of particular agency investigations, based on particularized facts. In other words, the statute authorizes the sort of limited reporting obligation that the Supreme Court allowed in *Morton Salt*. The statute does not authorize the wholesale reporting requirement imposed here.

The plain language of Section 5326(a) confirms this reading. First, Section 5326(a) states that an agency should act through an "order." As discussed above in the APA notice-and-comment analysis, an "order" is the result of an "adjudication." 5 U.S.C. § 551(7). There is no adjudication here. Second, Section 5326(a) specifies that a GTO

should apply to a "group of domestic financial institutions" in a "geographic area." These terms should not be read in their own, but rather, in conjunction with the whole statute. Read in conjunction with the word "order," that language limits GTOs to an identified business or group of businesses, not a category of businesses such as "MSBs" that apply indiscriminately to everyone meeting certain regulatory criteria.

Early rulemaking shortly after § 5326 was first enacted in 1988 confirms this interpretation. In 1989, the Treasury Department promulgated regulations for the issuance of GTOs. *See* 54 Fed. Reg. 33675 (Aug. 16, 1989) (codified at 31 C.F.R. 1010.370). The regulations provide that an "order…shall be directed to the Chief Executive Officer" of the targeted businesses and should require reports of transactions "by, through or to such financial institution specified in the order." 31 C.F.R. 1010.370. The requirement for a GTO to be directed to a "Chief Executive Officer" necessarily requires the GTO be issued to identified businesses, not a group of businesses such as MSBs generally.

In the accompanying release, the Treasury explained how it expected GTOs would work. After selecting a geographic area (which could range from "a few city blocks" to "a major metropolitan area"), the agency would "identify the affected financial institution or institutions in the geographic area that would receive the targeting order." 54 Fed. Reg. at 33675. "[G]eographic targeting orders would not be published in the Federal Register, but would be issued only to the affected financial institutions" generally by "certified or registered mail, return receipt requested." *Id.* at 33676-33677. The Treasury would also "contact the institution a few days after" and would "make every effort to work with the targeted financial institutions to ensure maximum compliance…at a minimum burden." *Id.* Overall, the Treasury expected a typical GTO would cover only 250 transactions per institution per year—or around 120 hours of paperwork burdens. *Id.* at 33678. The agency also spelled out why GTOs are presumptively confidential: "[O]nce criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch." *Id.* at 33678. Three years later,

19

Congress adopted the Treasury's regulatory practice, providing strong evidence that Congress approved of the Treasury's interpretation. *Novedades y Servicios, Inc. v. Financial Crimes Enforcement Network*, 785 F.Supp.3d 785, 811 (S.D. Cal. 2025).

Consistent with this rulemaking, early GTOs involved investigations into specific businesses and specific potential wrongdoing. For instance, in 1991, a business was targeted after an informant heard conversations about money laundering. *See United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994). Later in the 1990s, FinCEN issued GTOs directed at money remitters that were themselves suspected of laundering money to Colombia and the Dominican Republic.[4] *See also Novedades*, 785 F.Supp.3d at 812.

Over time, FinCEN's use of GTOs has become more aggressive. A 2014 GTO in Los Angeles targeted "nearly every business in the Fashion District"—some 2000 businesses ranging from lingerie stores to flower shops.[5] The next year, FinCEN targeted around 700 electronics-exporting businesses in Miami to "shed light on cash transactions that may be tied to trade-based money laundering."[6] Beginning in 2016, FinCEN issued successive GTOs requiring title insurance companies to report the identities of cash buyers or residential properties. That GTO first applied in New York City and Miami, but FinCEN broadened the scope with successive renewals, eventually covering dozens of

---

[4] Treasury Acts Against Flow of Dirty Money to Colombia (Dec. 23, 1996), https://www.fincen.gov/news/news-releases/treasury-acts-against-flow-dirty-money-colombia; Treasury Cracks Down on Remittances to Dominican Republic (Sept. 4, 1997), https://www.fincen.gov/news/news-releases/treasury-cracks-down-remittances-dominican-republic.

[5] FinCEN Issues Geographic Targeting Order Covering the Los Angeles Fashion District as Part of Crackdown on Money Laundering for Drug Cartels (Oct 2., 2014), https://www.fincen.gov/news/news-releases/fincen-issues-geographic-targeting-order-covering-los-angeles-fashion-district.

[6] FinCEN Targets Money Laundering Infrastructure with Geographic Targeting Order in Miami (Apr. 21, 2015), https://www.fincen.gov/news/news-releases/fincen-targets-money-laundering-infrastructure-geographic-targeting-order-miami.

cities in fourteen states and D.C.[7] The process of expansion culminated in a rulemaking that, beginning December 2025, applied the reporting requirement nationwide. *See* 89 Fed. Reg. 70258 (Aug. 29, 2024).

### C. Profound Irreparable Harms and Serious Questions About the Constitutional Merits Means that Plaintiff Is Entitled to a Preliminary Injunction

The preliminary injunction order should be granted. Plaintiff has shown profound irreparable harms and raised serious questions going to the merits. On the Ninth Circuit's "sliding scale," preliminary relief is warranted. No separate analysis is required for the public interest and balance of equities. "Plaintiffs who are able to establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (cleaned up).

Preserving the status quo, which is that CTRs are only required for transactions above $10,000, will work no practical harm to FinCEN. There is no urgent law enforcement need for the Border GTO. It isn't intended to stop any imminent crime. The GTO's stated purpose is data collection. It wants to assemble possibly millions of CTRs in the targeted locations so that the database can one day be examined for patterns that might reveal something about Mexican drug cartels. The prior iterations haven't had any demonstrable law enforcement outcomes, and this one is unlikely to either.

The only remaining question asks what relief should look like. The preliminary injunction should apply to Arizona. Plaintiff is proceeding under the APA, and "when a

---

[7] FinCEN expands Reach of Real Estate "Geographic Targeting Orders" Beyond Manhattan and Miami (July 27, 2016), https://www.fincen.gov/news/news-releases/fincen-expands-reach-real-estate-geographic-targeting-orders-beyond-manhattan; FinCEN Renews Real Estate Geographic Targeting Orders (Oct. 15, 2024), https://www.fincen.gov/news/news-releases/fincen-renews-real-estate-geographic-targeting-orders-0.

reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018) (cleaned up). This is because the APA provides that a court shall "hold unlawful and set aside" agency action that is "arbitrary [and] capricious," "not in accordance with law," "contrary to a constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2). That language specifically authorizes vacatur of unlawful agency action. The scope of preliminary relief should be no less broad. Under 5 U.SC. § 705, the appropriate preliminary remedy is to "postpone the effective date" of the agency action. The APA does not say that courts should postpone the effective date of the agency for some parties; it says the court should postpone the effective date of the "action."

This remains unchanged post-*Trump v. Casa*, 606 U.S. 831 (2025). *CASA* arose in a different context; it concerned universal injunctions of "executive or legislative policy" "under the Judiciary Act of 1789." *Id.* at 831, 840. *CASA* states that "nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. *See* 5 U.S.C. § 706(2)." *Id.* at 847 n. 10. Justice Kavanaugh suggested that courts "will grant or deny the functional equivalent of a universal injunction—for example…by setting aside or declining to set aside an agency rule under the APA." *Id.* at 873 (Kavanagh, J., concurring); *see also National TPS Alliance v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026) ("there are difficult and unanswered questions related to the limits of APA relief under [CASA]").

No bond should be required. Courts regularly waive the bond requirement, especially where, as here, there is a public-interest motivation behind the litigation. *See, e.g. Hualapai Indian Tribe v. Haaland*, 755 F.Supp.3d 1165 (D. Ariz. 2004) (waiving bond requirement).

## V.    Conclusion

For the foregoing reasons, Plaintiff respectfully asks the Court to enter a Preliminary Injunction. No bond should be required.


RESPECTFULLY SUBMITTED this 15th day of May, 2026.


**Saldivar & Associates, PLLC**


*/s/Maria David*
Jose A. Saldivar, Esq.
Maria David, Esq.
Saldivar & Associates, PLLC
2417 N. 24th St.
Phoenix, AZ 85008
jose@saldivarlaw.com
maria@saldivarlaw.com
*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I certify that on May 15, 2026, I electronically transmitted the attached document to the Clerk's office using the CM/ECF system, which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


*/s/Maria David*