# EXHIBIT 1

Jose A. Saldivar #022991
Maria David # 036176
**Saldivar & Associates, PLLC**
2417 N. 24th Street
PHOENIX, ARIZONA 85008
602-314-1340 telephone
602-354-3098 facsimile
jose@saldivarlaw.com
maria@saldivarlaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kiosko Multiservicios LLC; | No. 2:26-cv-02389-KML |
| Plaintiff, | |
| vs. | **DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| Financial Crimes Enforcement Network; Andrea Gacki, in her official capacity as Director of Financial Crimes Enforcement Network; U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; and Todd Blanche, in his official capacity as the Acting Attorney General of the United States, | |
| Defendants. | |

## DECLARATION OF ANDREA RUIZ

1.    My name is Andrea Ruiz. I am over eighteen (18) years of age. I am competent to make this declaration. All statements in this declaration are within my personal knowledge and are true and correct.

1

2.    I am the sole owner of Kiosko Multiservicios LLC ("Kiosko"), an Arizona Limited Liability company.

3.    I manage Kiosko on a day-to-day basis and have done so ever since Kiosko was formed. I have authority to speak for Kiosko.

4.    Kiosko is a Money Services Business ("MSB") registered with the federal Financial Crimes Enforcement Network ("FinCEN"). Kiosko operates in Maricopa County, Arizona.

5.    Kiosko has six retail locations in Phoenix, Arizona. Kiosko provides money services to the public at each of its retail locations, including money transfers, check cashing, money orders, and related services.

6.    Kiosko has operated since 2016. It is a small, independent business. Each retail location is manned by myself or one of my employees.

7.    Because it is located in Maricopa County, Arizona, Kiosko is subject to FinCEN's March 10, 2026, geographic targeting order (the "Border GTO") requiring currency transaction reports ("CTRs") for cash transactions of $1,000 or more.

8.    I am familiar with Kiosko's operations, staffing needs, transaction flow, customer traffic patterns, and compliance obligations.

9.    The Border GTO imposes a substantial and immediate operational burden on Kiosko. Although newly covered businesses were given until April 6, 2026, begin compliance, that timeframe was not enough for Kiosko to hire and train staff, adjust store operations, evaluate and implement software solutions, purchase necessary equipment,

Docusign Envelope ID: 4130DA67-6078-83DB-82F1-EE260C89DDEB

and absorb the customer-service impact of the new reporting requirements without severe disruption.

10. Kiosko provides services including check cashing, money orders, and money transfers. Prior to the TRO, Kiosko was required to collect information and file CTRs for check cashing and money orders of $1,000 or more. For money transfers, typically the Money Transmitter files the CTR instead of Kiosko filing the CTR directly.

11. Even when the Money Transmitter filed the CTR instead of Kiosko, that does not materially reduce Kiosko's burden. Kiosko must still collect the required customer information at the counter, verify that information, and transmit it to the Money Transmitter so the filing can be completed. In other words, Kiosko bears the frontline operational burden regardless of whether the CTR is filed by the Money Transmitter or by Kiosko directly.

12. I estimate that approximately 30-50% of Kiosko's transactions each month are for $1,000 or more but less than $10,000.

13. Kiosko does not cash checks of $10,000 or more but will do a wire transfer for over $10,000 (which occurs only once or twice per year, if at all). Kiosko has typically only filed a CTR once or twice per year in all the years it has been in business. Kiosko did not have any over-$10,000 transactions in 2025 or 2026.

14. I compiled the following information about Kiosko's transactions in March and April of 2026. This data was compiled from Kiosko's regularly maintained business

records in the ordinary course of business. To the best of my knowledge, information, and belief, this information is true, accurate, and complete.

| Category | March 2026 | April 2026 |
|---|---|---|
| Total Money Transactions | 12,001 | 9,502 |
| Transactions of $1,000 and More (by Month) | 4,066 | 2,147 |
| Percentage of Transactions of $1,000 and More | 33.88% | 22.60% |
| Transactions of $3,000 and More | 221 | 163 |
| CTRs Filed (by Month) by Kiosko | 871 | 930 |
| CTRs Filed (by Month) by Money Transmitter | 2,350 | 1,902 |
| Total CTR-Related Transactions | 3,221[1] | 2,832[2] |

The April 2026 figures show that overall transaction volume declined 20% compared to March 2026, dropping from 12,001 total transactions to 9,502 total transactions. Transactions of $1,000 and more also decreased substantially, from 4,066 in March to 2,147 in April. Despite that decline in business volume, the CTR-related workload remained extremely high. This shows that the burden imposed by the GTO does not decrease in proportion to the decline in transactions and continues to place substantial operational pressure on Kiosko.

The April figures also reflect that Kiosko has not had sufficient staffing to keep pace fully with the CTR-related workload. The company remains behind because existing

---

[1] This number is lower than the total transactions of $1,000 or more because the GTO's effective date was March 7, 2026.
[2] The Border GTO allows MSBs 30 days after the transaction to file the CTRs. Due to the high volume of CTR transactions, Kiosko has fallen behind and is not able to file CTRs on the same day it processes the transaction. Some of these CTRs were filed in April for transactions that took place in March.

personnel must collect additional customer information, verify documentation, and complete or transmit CTR-related reporting during live customer transactions, while also continuing to serve the public. As a result, Kiosko has not been able to file the CTR on the same day as the transaction, which further disrupts operations, increases customer delays, and heightens the risk of lost customers, loss of goodwill, and continued financial harm to the business.

15.     Where Kiosko files the CTR directly, the transaction takes approximately 15 to 18 minutes per transaction. Where Kiosko collects the required information and forwards it to the Money Transmitter, the transaction still takes approximately 10 to 15 minutes per transaction.

16.     Without the Border GTO, many of these transactions could usually be completed in approximately 1 to 2 minutes. The new requirements therefore materially slow down the customer-facing transaction itself, creating longer lines, longer wait times, customer frustration, abandoned transactions, lost business, and damage to customer goodwill.

17.     In my experience, Kiosko's customers are overwhelmingly locals in the Phoenix area. Most of Kiosko's customers are regulars.

18.     I do not believe that Kiosko's customers are involved with cartels or other criminal activity. I believe Kiosko's customers are honest, hardworking people. I know because I talk to them almost every day.

19.  I believe that Kiosko's customers use Kiosko's services to do legal things. Most use Kiosko's services to cash paychecks, pay rent, and send money to family.

20.  A lot of customers are low-income and do not use banks. They rely on Kiosko to turn their paychecks into cash.

21.  Kiosko keeps records required by both Arizona and federal law and complies with state and federal regulations related to MSBs.

22.  Kiosko's customers often do not expect to be asked for additional personal information in what they view as a routine transaction. As a result, the added questioning and verification requirements create resistance, confusion, and delay at the counter.

23.  Many of Kiosko's customers do not want to provide their sensitive, personal information every time they do their legal, low-dollar, everyday transactions.

24.  The Border GTO has already hurt my business. Customers are increasingly reluctant to provide the sensitive personal information required to complete CTRs under the Border GTO. Many of Kiosko's customers value privacy and are uncomfortable disclosing identifying details or the purpose of their transactions, particularly for routine financial services. As a result, when informed of these requirements, some customers have declined to proceed with transactions and instead take their business elsewhere. This reluctance has already resulted in lost transactions and diminished customer trust, further reducing Kiosko's revenue and exacerbating financial strain caused by the increased compliance burden.

25.     The Border GTO has also caused customer walk-aways and lost transactions due to increased transaction times, particularly during peak periods on weekdays and weekends when stores are busiest and delays are most damaging. The Border GTO has also caused caused the loss of customers who do not want to provide detailed, personal information for routine, everyday transactions. **This is based on my direct observation and consistent reports from store managers and cashiers.** Customers who are already waiting in line often leave without completing their transactions when the process takes significantly longer because of the new information-collection and verification requirements. Many of these are recurring customers, and once they become frustrated by the delays and personal information requests, they may take their business elsewhere. The disruptions caused by the GTO have caused Kiosko to lose at least 500 customers, and very likely more. Most regular customers who cash checks will cash two checks per month. Kiosko cashed 200 fewer checks in April 2026, representing a loss of 100 check cashing customers. Customers who do wire transfers typically do 2 or 3 wire transfers per month. Kiosko did 1,500 fewer wire transfers in April 2026, which I conservatively estimate as a loss of 400 wire transfer customers, but this number is likely higher. This represents the loss of regular customers. I have called some customers to ask the reason why they stopped using Kiosko's services. Some customers told me that they went elsewhere (like to credit unions or banks) because those places do not ask for intrusive personal information. Many customers I called did not answer their phone.

7

26. Once customers take their business elsewhere, they may never return to Kiosko.

27. Using March 2026 data, the burden on Kiosko was substantial. The 871 CTRs filed directly by Kiosko required approximately 217.75 to 261.30 labor-hours in a single month. The 2,350 transactions for which Kiosko had to collect information and send it to the Money Transmitter required approximately 391.67 to 587.50 labor-hours. In April 2026, the burden on Kiosko remained high. The 930 CTRs filed directly by Kiosko required approximately 232.5 to 279 labor-hours and the 1902 CTRs filed by the money transmitter required approximately 317 to 475.5 labor-hours.

28. Combined, Kiosko incurred approximately 609.42 to 848.80 additional labor-hours in March 2026 and 549.5 to 754.5 additional labor-hours in April 2026 solely from CTR-related compliance handling. However, this decrease in additional labor-hours in April 2026 is due to the 20% decline in overall transactions and has substantially harmed Kiosko's revenue.

29. Spread across six branches, this equals approximately 101.57 to 141.47 additional labor-hours per branch per month, and that figure does not include supervisory review, training, corrections, queue management, customer-service disruption, or management oversight.

30. Kiosko cannot solve this problem by simply hiring one person to fill out CTRs. The real burden occurs live at the counter, in real time, across six stores, while customers are waiting.

31. During the week, customer traffic increases significantly from Monday through Thursday during afternoon peak hours, when each store would need at least one additional person to handle the extra intake, verification, and information-gathering burden without causing substantial delays and losing customers. In addition, Friday through Sunday are the busiest days overall, and those days also require additional staffing because transaction volume is consistently higher and the same Border GTO-related information must still be collected, verified, and entered while serving customers.

32. The practical problem is that, on many weekdays, the heaviest need is concentrated in approximately two peak hours per store, per day. In my experience, it is not realistic to expect a qualified employee to work only a two-hour daily shift. As a practical matter, Kiosko would need to offer at least a four-hour shift to recruit and retain new employees. As a result, the actual labor burden is materially higher than a narrow peak-hours estimate might suggest.

33. Hiring additional employees also does not provide an immediate or simple solution. In practice, the Border GTO forces Kiosko into a costly and time-consuming hiring cycle. Recruiting suitable personnel for this kind of customer-facing, regulated position may itself take up to one month. I or a supervisor must identify applicants, evaluate qualifications, conduct interviews, make a hiring decision, and complete onboarding before a new employee can begin training and assume responsibility in the store.

34.     In my experience, a typical hiring cycle consumes at least 10 hours of my time or supervisor time for recruiting, interviews, selection, offer, and onboarding, at approximately $21 per hour, and often more. Each unsuccessful applicant may consume an additional 2 to 3 hours of supervisor time. In my experience, in order to find one qualified employee, Kiosko must consider and interview approximately 5 to 8 applicants.

35.     Even after hiring, the new employee must spend 80 to 100 hours undergoing one-on-one training before that employee can independently assist customers. That training must include not only legal compliance obligations and how to complete CTR-related work, but also the internal operational processes necessary to recognize when a CTR must be completed, what information must be collected, how transactions should be handled at the counter, and how the business functions in practice. Without adequate training, employees may make mistakes that expose the company to compliance failures, reporting errors, penalties or fines, and even criminal liability.

36.     The direct labor cost of that training is substantial. The trainee is paid approximately $15.15 per hour, and the trainer is paid approximately $17.50 to $21 per hour. The trainee's wages alone add approximately $1,212 to $1,515 per new hire for training, and the combined direct wage cost of trainer and trainee is approximately $2,612 to $3,615 per new hire in training expenses. This does not account for the lost productivity and operational disruption caused by taking an experienced employee away from productive work to provide one-on-one training.

10

37. These costs are compounded by turnover. Approximately one out of every three new hires does not remain with the company. When that occurs, Kiosko absorbs the recruiting, onboarding, and training costs without a durable return and must begin the process again. For a six-location retail business already facing real-time customer delays under the GTO, this repeated cycle materially increases the risk of reduced service capacity, lost customers, and further damage to goodwill.

38. The burden is not materially eliminated by commercially available CTR software. Although such systems may assist with data storage or filing, they do not significantly reduce transaction time, especially for first-time customers. At a minimum, the first time a customer is entered into the system, staff must create the customer profile, input the required information, and verify the customer data. That process alone takes approximately 10 to 15 minutes.

39. Software implementation also imposes additional cost and delay. Kiosko would need to evaluate vendors, select a system, purchase the software, acquire and install supporting equipment for 14 computers, train staff, test the system, and integrate it into live store operations. The supporting equipment alone would cost approximately $800 per workstation, for a minimum hardware cost of approximately $11,200, not including software, installation, scanners, cameras, testing, maintenance, or troubleshooting.

11

40. Even with software, Kiosko would still need additional personnel because the customer-facing intake, questioning, verification, and data-entry burden would remain. Software therefore does not solve the underlying operational problem.

41. If I, as the owner, am forced to absorb this work personally, the harm is no less serious. I would be pulled away from managing and growing the business and forced back into day-to-day compliance operations. To meet these demands, I would be required to work substantially longer hours, including evenings and weekends. This would come at the expense of time with my family and personal obligations, while not meaningfully increasing the income available to support them. Alternatively, if I attempt to reduce my own involvement to preserve time with my family, Kiosko will be unable to meet its compliance obligations or maintain its level of service. In either case, the Border GTO imposes a significant personal and financial hardship that directly threatens both my livelihood and my family's well-being.

42. Even if I personally completed CTR-related work, I still could not physically attend to customers across all six stores at the same time. The most immediate burden occurs when the customer arrives at the counter, because staff must request the additional information, verify it, and complete or begin the required forms during the live transaction.

43. The Border GTO therefore imposes an unsustainable burden on Kiosko. It requires the business to absorb substantial new labor, hiring, training, technology, and implementation costs across all six locations while simultaneously slowing customer

12

service, increasing abandoned transactions, and undermining customer confidence. In a high-volume retail MSB business, those burdens directly threaten the company's ability to maintain normal operations and keep all of its locations open.

44.      Kiosko cannot simply increase prices to account for new compliance costs. Kiosko operates in a highly price-sensitive market, serving customers who can readily shift to banks (which are not subject to the Border GTO) or to MSB's in neighboring La Paz, Yavapai, Gila, and County that are not targeted by the Border GTO. If Kiosko raises its fees to offset these increased compliance costs, it will lose customers and revenue to competitors who either are not subject to the same burdens or who operate outside the regulated system. Conversely, if Kiosko maintains its current pricing, its already narrow margins will be insufficient to cover the added labor expenses, resulting in sustained operating losses and store closures that threaten the viability of the business. Either way, Kiosko will be required to close stores, if it does not go out of business entirely.

45.      My family and I rely on Kiosko for our living. Kiosko operates six locations, which together generates the revenue necessary to sustain the business and provide my sole source of income. Due to the increased compliance costs and operational burdens imposed by the Border GTO, I would be forced to consolidate operations and close all but one or two of these locations, which would be operated by myself and my husband. This contraction would significantly reduce overall transaction volume and revenue, while many fixed costs would remain. As a result, my family's income—derived entirely from Kiosko—would be substantially reduced. Because I do not have

another source of income, this loss would have a direct and immediate impact on my ability to support myself and my family, placing us at great financial risk.

46.     I believe the Border GTO invades the privacy of Kiosko by requiring that Kiosko turn over its business records, even though the government does not suspect Kiosko of any crime or have a warrant.

47.     Further, I believe the federal government is invading Kiosko's customers' privacy and making Kiosko a party to that privacy invasion.

48.     The Border GTO also makes Kiosko turn over customers' private information to the federal government, when the government does not suspect Kiosko's customers of any crime or have a warrant. The $1,000 limit means that 30-50% of transactions will now need a CTR. The government seems to think that everyone is potentially guilty of something, so a record must be made so everyone can potentially be investigated. I have been in the money services business for many years. I understand that we have a lot of regulations to follow. But this goes too far. The government isn't looking for that rare situation in which a very large transaction will lead to a big crime or a gang. This is just the government watching everyone. The Border GTO makes Kiosko a sort of spy on Kiosko's customers for the federal government.

49.     Kiosko does not want to invade its customer's privacy. If the government ever had a warrant based on a real concern about actual crime, Kiosko would cooperate. Kiosko has no desire to deal with criminals or protect criminals.

50. Kiosko wants to stay in business and continue to offer valuable services to regular people.

51. For all of these reasons, the injury to Kiosko is immediate and irreparable. The Border GTO causes longer wait times, customer frustration, abandoned transactions, loss of customers, harm to goodwill, reputational injury, increased labor costs, technology costs, implementation burdens, and operational instability across six locations.

52. In my judgment, based on Kiosko's actual March and April 2026 transaction volume, staffing realities, hiring delays, training requirements, and operating model, the burdens imposed by the Border GTO are not costs the business can absorb indefinitely without jeopardizing its continued operation of multiple locations. If the GTO remains in force without relief, Kiosko faces a credible and imminent risk of being forced to close all but one or two locations, if it can remain in business at all.

53. This harm is not speculative. It is based on the actual transaction volume, staffing realities, operational burden, hiring delays, training requirements, and customer-service disruption reflected in Kiosko's pre-TRO experience under the GTO. Once customers are lost because of delays, frustration, or reluctance to provide additional personal information, that loss of goodwill and customer trust is difficult to reverse. If customers take their business elsewhere, it is likely that they may never return to Kiosko.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

15

Docusign Envelope ID: 4130DA67-C078-83DB-82F1-EE260C89DDEB

Dated May ⟨14⟩____, 2026.

DocuSigned by:

*Andrea Ruiz*

51310CCE24B74AD...

Andrea Ruiz

# EXHIBIT 2

## DECLARATION OF EZ CHECK CASHING, INC

I, Meyerlin Herrera, declare under penalty of perjury as follows:

1. I am the owner and operator of EZ Check Cashing, Inc., a licensed money services business operating six (6) locations in Phoenix, Arizona. I make this declaration based on my personal knowledge and, if called as a witness, I could and would testify competently to the matters stated herein.

2. The recently imposed FinCEN Geographic Targeting Order ("GTO") has caused immediate and substantial operational disruption to my business. The burdens created by the GTO are not limited to administrative or back-office compliance obligations. They occur directly at the customer counter during live transactions and materially interfere with the ordinary operation of my business.

3. Prior to implementation of the GTO, routine customer transactions could generally be processed efficiently and within a reasonable period of time. Since implementation of the GTO, employees must now collect additional identifying information, perform enhanced verification procedures, and complete or initiate Currency Transaction Report ("CTR") compliance steps during customer interactions.

4. These additional compliance requirements substantially increase the amount of time required to process affected transactions. As a result, customers experience significantly longer wait times, longer lines, transaction delays, and interruptions in service. Customers have become frustrated, abandoned transactions, and, in some cases, chosen to conduct business elsewhere.

5. The operational burden imposed by the GTO has required and continues to require substantial additional staffing, employee training, compliance oversight, and payroll expenses across all six locations. Based on current operational estimates, compliance with the GTO requires the equivalent of multiple additional full-time employees solely to manage the increased reporting and verification obligations.

6. These burdens are not speculative, hypothetical, or temporary inconveniences. They are ongoing and immediate harms affecting the daily viability of my business. The increased labor costs, reduced transaction efficiency, customer loss, and reputational harm cannot easily be recovered through monetary damages after the fact.

7. The loss of customer goodwill is particularly damaging in the money services industry, where customers rely heavily on speed, convenience, and trust. Once customers permanently take their business elsewhere, that loss is difficult or impossible to reverse.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12 day of May , 2026.


Meyerlin Herrera
Owner, EZ Check Cashing, Inc.

## 1. Total work needed per month

- 8,000 reports
- Each report takes 10 minutes

Total minutes needed:

$$8000 \times 10 = 80,000 \text{ minutes}$$

Convert to hours:

$$80,000 \div 60 = 1,333.33 \text{ hours/month}$$

## 2. Productive hours per employee

Each employee:

- Works 40 hours/week
- Gets 1 hour rest per workday

Assuming a standard 5-day workweek:

- 40 hours/week = 8 hours/day
- Minus 1 hour rest/day
- Actual productive work = 7 hours/day

So productive hours per week:

$$7 \times 5 = 35 \text{ productive hours/week}$$

Average monthly productive hours:

$$35 \times 4.33 \approx 151.6 \text{ hours/month}$$

---

## 3. Employees required

$$1333.33 \div 151.6 \approx 8.8$$

We would need:

**9 employees minimum**

To safely handle the workload, you'd probably hire **10 employees** to cover:

- sick days
- training
- slower workers
- quality checks
- peak periods

So:

- **Bare minimum:** 9 employees
- **Recommended:** 10 employees

If I pay **$20 per hour**, let's calculate the monthly payroll cost.

**9 employees**.

Each employee works:

- 40 hours/week
- About 4.33 weeks/month

Monthly paid hours per employee:

$$40 \times 4.33 \approx 173.2 \text{ hours/month}$$

Monthly pay per employee:

$$173.2 \times 20 = 3,464$$

For 9 employees:

$$3,464 \times 9 = 31,176$$

**Estimated monthly expense**

- **9 employees:** about **$31,176/month**
- **10 employees:** about **$34,640/month**

This is payroll only and does **not** include:

- taxes

- benefits

- insurance

- software/equipment

- overtime

- office costs

In the U.S., a realistic fully-loaded employee cost is often **25%–40% higher** than base wages. So your real monthly staffing cost could be closer to:

- **9 employees:** ~$39k–$44k/month

- **10 employees:** ~$43k–$49k/month

# EXHIBIT 3

# AFFIDAVIT OF MUJUBUR R MUSAFARGANI

State of **Arizona**

County of **Maricopa**

I, Mujubur R MusafarGani, declare as follows:

1. I am the owner of $1 Store Corp, located at 107 N Capitol Ave, Gilabend AZ 85337, a money services business that provides check cashing, money orders, money transfers and related services.
2. The GTO has imposed substantial burdens on transactions that my customers have long regarded as quick and routine. These transactions now require added questioning, identity verification, and additional reporting steps that materially slow service.
3. My customers often come to my business because it is faster and more accessible than other options. When wait times increase and customers are asked for more personal information, many become frustrated and some leave without completing their transactions.
4. This causes immediate loss of revenue and long-term damage to customer goodwill. Once those customers take their business elsewhere, they may not return.
5. My business cannot sustain this level of disruption indefinitely. If the GTO remains in force, it creates a real risk of significant operational cutbacks or closure.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12 day of ___5th___, 2026, in Phoenix, Arizona.

[Signature] _M̶_____

[Name] MUJUBUR R MUSARFARGANI

CS CamScanner

# EXHIBIT 4

## DECLARATION OF ESTELA SOLIS

I, Estela Solis, declare as follows:

I am the owner of ALEX CHECK CASHING SERVICES, a single-location money services business serving customers in Phoenix, Arizona.

The GTO has significantly disrupted the way my business serves customers. What used to be a quick transaction now often requires additional questions, identity verification, and extra reporting steps while the customer is standing at the counter.

My customers are working people who depend on fast, in-person service. Many do not expect to be asked for additional personal information for transactions they consider routine. As a result, customers become frustrated, leave without completing transactions, or choose not to return.

Because I operate a small business, I do not have excess staff or extra compliance personnel available to absorb this burden. The GTO forces me to choose between slowing customer service, losing business, or taking on costs that my business cannot sustain.

If this continues, the damage to customer trust, goodwill, and revenue may force my business to reduce operations or close.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12 day of May, 2026, in Phoenix, Arizona.

Signature

*Estela Solis*

Estela Solis

State Of Arizona
County Of Maricopa

HILDA A. MUNOZ
Notary Public, State of Arizona
Maricopa County
Commission # 635530
My Commission Expires
August 04, 2026

City/County of _Phoenix, Maricopa County_
State of Arizona
Subscribed and sworn to before me
this _12th_ day of _May_, _2026_
by _Estela Solis_
_____ Notary Public
My commission expires _8/04/2026_

Scanned with
 CamScanner

# EXHIBIT 5

## PERSONAL AFFIDAVIT

STATE OF ARIZONA

COUNTY OF MARICOPA

Hereby, I, Patricia Berrelleza, declare as follows:

1. I am the owner of CASA DE CAMBIO YAQUI, a money services business serving customers in 535 E SOUTHERN AVE, MESA AZ 85204.

2. The GTO has already damaged the relationship between my business and its customers. Customers who expect fast service are now confronted with longer delays and requests for personal information they did not previously have to provide.

3. Some customers leave without completing transactions, and others become frustrated and say they will not return. Many of these are repeat customers whose trust and loyalty took years to build.

4. Once those customers are lost, the harm is difficult to reverse. Damage to goodwill, customer trust, and reputation cannot be fully repaired by later money damages.

For that reason, the GTO causes immediate and irreparable harm to my business, apart from the added compliance costs themselves.

I declare under penalty of perjury under the laws of Arizona that the foregoing statements are true and correct to the best of my personal knowledge.

Executed this 13 day of May , 2026, at _____

JOSEFINA RASMUSSEN
NOTARY PUBLIC - ARIZONA
Maricopa County
Commission # _____
My Commission Expires
February 2028

**Name and signature of Declarant**

# EXHIBIT 6

# DECLARATION OF BARBARA TORRES MARTINEZ

I, Barbara Torres Martinez, declare as follows:

FRIST: I am the owner of LA TIA MONEY TRANSFER SERVICES, a money services business whose operations include a high volume of money transfers and Check Cashing.

SECOND: Even when the Money Transmitter ultimately files the CTR for wire transfers, my business still bears the frontline burden. My staff must collect the required customer information, verify it, and transmit it so the filing can be completed.  And we have to file the CTR for Check Cashing.

THIRD: That means the GTO does not simply shift the burden to the Money Transmitter. The burden still falls on my business at the counter, in real time, while customers are waiting.

FOURTH: The result is slower service, longer lines, walk-aways, lost transactions, and damage to customer goodwill. This is particularly harmful in a high-volume retail environment where customers expect speed and predictability.

FIFTH: If the GTO remains in effect, my business will continue to suffer operational disruption, customer loss, and a serious threat to its continued viability.

I declare under penalty of perjury that the foregoing is true and correct.

STATE OF ARIZONA

COUNTY OF  MARICOPA

Executed on this 13 day of _____ , 2026, in Phoenix, Arizona_.

Barbara Torres Martinez

CamScanner

# EXHIBIT 7

## DECLARATION OF KELYN CONSUELO VARGAS CORTEZ

I,KELYN CONSUELO VARGAS CORTEZ,declare as follows:

My business is VARIEDADES KELYN, a money services business whose operations include a high volume of money transfers and Check Cashing, I have two location at: 4201 w Bethany home rd Phoenix az 85019 and 4008 n 19th Ave Phoenix az 85015.

Even when the Money Transmitter ultimately files the CTR for wire transfers, my business still bears the frontline burden. My staff must collect the required customer information, verify it, and transmit it so the filing can be completed. And we have to file the CTR for Check Cashing.

That means the GTO does not simply shift the burden to the Money Transmitter. The burden still falls on my business at the counter, in real time, while customers are waiting.

The result is slower service, longer lines, walk-aways, lost transactions, and damage to customer goodwill. This is particularlyharmful in a high-volume retail environment where customers expect speed and predictability.

If the GTO remains in effect,my business will continue to suffer operational disruption,customer loss,and a serious threat to its continued viability.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of May, at the State of Arizona, County of Maricopa..

Kelyn Vargas

Name and Signature of the Declarant:


CamScanner