BRETT A. SHUMATE
Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
STEPHEN M. ELLIOTT
Assistant Branch Director
JACOB S. SILER
RYAN M. UNDERWOOD
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L. St. NW
Washington, DC 20005
Tel: (202)305-1952
Email: ryan.m.underwood2@usdoj.gov
Attorneys for Defendant

UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kiosko Multiservicios LLC, | Case No.: 2:26-cv-02389-KML |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| Financial Crimes Enforcement Network, et al., | |
| Defendants. | |

26-cv-02389-KML

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................1

II.     BACKGROUND ................................................................................1

III.    LEGAL STANDARD ........................................................................5

IV.     ARGUMENT ......................................................................................6

    A.      Plaintiff Fails to Establish a Likelihood of Success on the
            Merits. ........................................................................................ 6

        1.      Reporting Requirements Do Not Violate the Fourth
                Amendment. .....................................................................6

        2.      The GTO Is Not Subject to "Notice and Comment"
                Requirements. ................................................................10

        3.      5 U.S.C. § 559 Is Inapplicable. .....................................12

        4.      The GTO Is Not "Arbitrary and Capricious." ............12

            a.      Expansion to Maricopa County Was Not
                    Arbitrary ...............................................................14

            b.      The $1000 Transaction Threshold Is Not
                    Arbitrary. ..............................................................15

            c.      Cartel Countermeasures Were Considered. .........16

            d.      FinCEN's Ability to Utilize the Information
                    Generated by the GTO. ........................................16

            e.      FinCEN Considered the Impacts of the GTO on
                    MSBs. ....................................................................18

        5.      The GTO is not Ultra Vires and is Fully Authorized by
                Statute. ............................................................................18

    B.      Kiosko Asserts Only Weak and Avoidable Irreparable
            Harm ..........................................................................................24

    C.      The Balance of Equities and Public Interest Favor
            Defendants ................................................................................27

D. The Court Should Not Hold an Evidentiary Hearing and Should Exclude Kiosko's Extra-Record, Third-Party Evidence .................................................................28

E. Any Injunction Should Be Limited to Plaintiff. .......................30

F. Plaintiff Should be Required to Post a Bond ...........................32

V. CONCLUSION .................................................................................33

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for the Wild Rockies v. Petrick,*
68 F.4th 475 (9th Cir. 2023) ...................................................................................... 6

*Andreiu v. Ashcroft,*
253 F.3d 477 (9th Cir. 2001) ..................................................................................... 6

*Babb v. Wilkie,*
589 U.S. 399 (2020).................................................................................................. 20

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
502 U.S. 32 (1991).................................................................................................... 19

*Bhd. of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Emps.,*
380 U.S. 650 (1965).................................................................................................. 19

*Bond v. United States,*
572 U.S. 844 (2014).................................................................................................. 22

*Brock v. Emerson Elec. Co.,*
834 F.2d 994 (11th Cir. 1987) ................................................................................... 9

*Califano v. Sanders,*
430 U.S. 99 (1977).................................................................................................... 12

*California Bankers Ass'n v. Shultz,*
416 U.S. 21 (1974).......................................................................................... 6, 7, 8, 10

*Camp v. Pitts,*
411 U.S. 138 (1973)........................................................................................ 28, 29, 30

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971).................................................................................................. 12

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015)................................................................................................... 9

*Dept. of Agric. Rural Dev. Rural Hous. Serv. V. Kirtz,*

601 U.S. 42 (2024)......................................................................................22

*Donovan v. Master Printers Ass'n,*

532 F. Supp. 1140 (N.D. Ill. 1981)............................................................10

*DSE, Inc. v. United States,*

169 F.3d 21 (D.C. Cir. 1999).....................................................................32

*Eco Tour Adventures, Inc. v. Zinke,*

249 F. Supp. 3d 360 (D.D.C. 2017)...........................................................29

*FCC v. Fox Television Stations, Inc.,*

556 U.S. 502 (2009)...................................................................................13

*Feliciano v. Department of Transp.,*

605 U.S. 38 (2025).....................................................................................21

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*

98 F.4th 1180 (9th Cir. 2024) ......................................................................6

*Friends of the Clearwater v. Dombeck,*

222 F.3d 552 (9th Cir. 2000) .....................................................................28

*Friends of the Earth v. Hintz,*

800 F.2d 822 (9th Cir. 1986) .....................................................................29

*Garcia v. Google, Inc.,*

786 F.3d 733 (9th Cir. 2015) .......................................................................5

*George v. McDonough,*

596 U.S. 740 (2022)...................................................................................21

*Goldie's Bookstore, Inc. v. Superior Court,*

739 F.2d 466 (9th Cir. 1984) .....................................................................24

*Hecht Co. v. Bowles,*

321 U.S. 321 (1944).............................................................................30, 31

*Hernandez v. City of Phoenix,*

432 F. Supp. 3d 1049 (D. Ariz. 2020) .......................................................29

26-cv-02389-KML

*Hernandez v. Sessions*,

   872 F.3d 976 (9th Cir. 2017) ................................................................................. 27

*Immigr. Defs. L. Ctr. v. Noem*,

   145 F.4th 972 (9th Cir. 2025) ............................................................................... 32

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,

   799 F.2d 547 (9th Cir. 1986) ................................................................................. 28

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,

   634 F.2d 1197 (9th Cir. 1980) ............................................................................... 25

*Lackey v. Stinnie*,

   604 U.S. 192 (2025) ............................................................................................... 21

*Leiva-Perez v. Holder*,

   640 F.3d 962 (9th Cir. 2011) ................................................................................... 5

*Lopez v. Brewer*,

   680 F.3d 1068 (9th Cir. 2012) ................................................................................. 1

*Maharaj v. Ashcroft*,

   295 F.3d 963 (9th Cir. 2002) ................................................................................... 5

*Massachusetts v. Dep't of Educ.*,

   C.A. No. 26-11229-FDS, 2026 WL 1114877 (D. Mass. Apr. 24, 2026) ...................... 32

*McLaughlin v. Kings Island, Div. of Taft Broad. Co.*,

   849 F.2d 990 (6th Cir. 1988) ................................................................................... 9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

   463 U.S. 29 (1983) ................................................................................................. 12

*Nat'l Biodiesel Bd. v. Env't Prot. Agency*,

   843 F.3d 1010 (D.C. Cir. 2016) .............................................................................. 11

*Nat'l TPS All. v. Noem*,

   150 F.4th 1000 (9th Cir. 2025) ............................................................................... 32

*Nat'l TPS All. v. Noem*,

   166 F.4th 739 (9th Cir. 2026) ................................................................................. 32

26-cv-02389-KML

*Neustar, Inc. v. Fed. Commc'ns Comm'n*,

857 F.3d 886 (D.C. Cir. 2017) .................................................................................. 11

*Nken v. Holder*,

556 U.S. 418 (2009) ............................................................................................... 5, 27

*Nuclear Regul. Comm'n v. Texas*,

605 U.S. 665 (2025) .................................................................................................. 19

*Pablo Sequen v. Albarran*,

814 F. Supp. 3d 1005 (N.D. Cal. 2025) .................................................................... 32

*Perez v. Mortg. Bankers Ass'n*,

575 U.S. 92 (2015) .................................................................................................... 11

*Public Power Council v. Johnson*,

674 F.2d 791 (9th Cir. 1982) .................................................................................... 29

*Regents of Univ. of Cal. v. DHS*,

908 F.3d 476 (9th Cir. 2018) .................................................................................... 30

*Riverhead Farms, Inc. v. Madigan*,

958 F.2d 1479 (9th Cir. 1992) .................................................................................. 23

*Sampson v. Murray*,

415 U.S. 61 (1974) .................................................................................................... 31

*Slide-Lok Modular Storage Sys., Inc. v. Flexmar Coatings, LLC*,

No. CV 08-0279-PHX-MHM, 2008 WL 4649035 (D. Ariz. Oct. 21, 2008) ............... 28

*Taggart v. Loretzen*,

587 U.S. 554 (2019) .................................................................................................. 21

*Tohono O'odham Nation v. Ducey*,

130 F. Supp. 3d 1301 (D. Ariz. 2015) ...................................................................... 26

*Trump v. CASA, Inc.*,

606 U.S. 831 (2025) .................................................................................................. 30

*Ty, Inc. v. GMA Accessories, Inc.*,

132 F.3d 1167 (2d Cir. 1997) ................................................................................... 28

26-cv-02389-KML

*United States v. Brignoni-Ponce,*

    422 U.S. 873 (1975)........................................................................................................5

*United States v. Morton Salt Co.,*

    338 U.S. 632 (1950)...................................................................................................7, 20

*United States v. Texas,*

    599 U.S. 670 (2023)......................................................................................................31

*United States v. W. H. Hodges & Co., Inc.,*

    533 F.2d 276 (5th Cir. 1976) .......................................................................................11

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*

    435 U.S. 519 (1978)......................................................................................................11

*Walsh v. Ahern Rentals, Inc.,*

    No. 21-16124, 2022 WL 118636 (9th Cir. Jan. 12, 2022)......................................28, 29

*Wayte v. United States,*

    470 U.S. 598 (1985).......................................................................................................5

*Weinberger v. Romero-Barcelo,*

    456 U.S. 305 (1982)..................................................................................................26, 30

*West Virginia v. EPA,*

    597 U.S. 697 (2022)......................................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008).....................................................................................................*passim*

*Yesler v. Terrace Cmty. Council v. Cisneros,*

    37 F.3d 442 (9th Cir. 1994) .........................................................................................20

**Statutes**

5 U.S.C. § 551 .....................................................................................................10, 12, 20

5 U.S.C. § 559 .............................................................................................................12

5 U.S.C. § 702 .............................................................................................................30

5 U.S.C. § 705 .............................................................................................................31

5 U.S.C. § 706 .............................................................................................................28

8 U.S.C. § 1324a.................................................................................................8

12 U.S.C. § 1829b .............................................................................................2

26 U.S.C. § 6012 ...............................................................................................9

31 U.S.C. § 3526 .............................................................................................21

31 U.S.C. § 5311 .....................................................................................2, 3, 23

31 U.S.C. § 5312 ...............................................................................................2

31 U.S.C. § 5313 .................................................................................... 2, 11, 21

31 U.S.C. § 5314 .......................................................................................... 2, 21

31 U.S.C. § 5318 ...............................................................................................3

31 U.S.C. § 5326 .......................................................................................passim

31 U.S.C. §§ 5316-5336 ...................................................................................2

52 U.S.C. § 30104 .............................................................................................8

52 U.S.C. § 30107 .............................................................................................8

Pub. L. No. 100–690, 102 Stat. 4181 (1988)....................................................2

Pub. L. No. 107-56, 115 Stat. 272 (2001) ......................................................22

**Rules**

Federal Rule of Civil Procedure 65 .................................................................32

**Regulations**

31 C.F.R. § 103.22.............................................................................................7

31 C.F.R. § 1010.100.........................................................................................4

31 C.F.R. § 1010.311.........................................................................................2

31 C.F.R. § 1010.312.........................................................................................5

31 C.F.R. § 1010.370.........................................................................................3

31 C.F.R. § 1010.370.......................................................................................23

31 C.F.R. § 1010.970.........................................................................................3

85 Fed. Reg. 29,022 (May 14, 2020)......................................................... 24, 25

89 Fed. Reg. 7767  (Feb. 5, 2024) ..................................................................24

91 Fed. Reg. 11456 (Mar. 10, 2026) .........................................................passim

**Other Authorities**

11A Charles Alan Wright et al.,Federal Practice and Procedure § 2947
(3d ed. Apr. 2026)..................................................................................................27

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) .........32

FinCEN, Frequently Asked Questions ("FAQs") (Mar. 19, 2026),
https://www.fincen.gov/system/files/2026-03/SWB-GTO-FAQs.pdf ...........................4

Group, Merriam-Webster Dictionary Online, https://www.merriam-
webster.com/dictionary/group .................................................................................23

H.R. Rep. No. 101-74 (1988), 1989 U.S.C.C.A.N. 17......................................................2

*Samuel L. Bray, The Mischief Rule*,
109 Geo. L.J. 967 (2021) .......................................................................................22

U.S. Dep't of Treasury, Treasury Order 180-01 (Jan. 14, 2020),
https://home.treasury.gov/about/general-information/orders-and-directives/treasury-
order-180-01 .........................................................................................................3

## I.    INTRODUCTION

On March 10, 2026, acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order ("GTO") that requires money services businesses ("MSBs") in certain counties near the southwest border to keep additional records and report additional categories of currency transactions to FinCEN. In support of this Order, the agency found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO are necessary to carry out the purposes of the Bank Secrecy Act ("BSA") or to prevent evasions thereof and are in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors near the southwest border of United States. That determination was supported by the agency's careful analysis of the need for the GTO, as reflected in the redacted February 26, 2026 memorandum previously filed by Defendants, which forms part of the administrative record. ECF No. 24-1 ("GTO Mem.").[1]

Plaintiff, an MSB with six locations in Maricopa County, filed this action to enjoin the GTO. Plaintiff cannot show a likelihood of success on the merits that would justify the "extraordinary and drastic remedy" it seeks. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted). Rather, this case involves a temporary, geographically limited reporting requirement that, to mitigate burden, has been effected as a modification to an existing FinCEN reporting requirement. None of Plaintiff's claims warrant the drastic remedy of a preliminary injunction, as discussed below.

## II.    BACKGROUND

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the BSA. The BSA authorizes the Department of the Treasury to impose reporting and other requirements on financial institutions and other businesses to help detect and prevent

---

[1] A partially unredacted version of this memorandum has been filed separately under seal.

money laundering. These requirements are codified at 12 U.S.C. § 1829b, *id.* §§ 1951-1960, 31 U.S.C. §§ 5311-5314, 5316-5336, including notes thereto. Among many other requirements and authorities, the BSA and its implementing regulations require financial institutions to file a currency transaction report ("CTR") for transactions in currency greater than $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

Separately, the Anti-Drug-Abuse Act of 1988 amended the BSA to give the Secretary of the Treasury ("Secretary") additional authority to collect information about certain currency transactions in geographic areas thought to pose particular risks. Pub. L. No. 100–690, tit. VI, § 5325(c), 102 Stat. 4181, 4355 (1988). The original purpose was to grant the Secretary "discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H.R. Rep. No. 101-74, at 111 (1988), *reprinted in* 1989 U.S.C.C.A.N. 17. As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—
> (1) to obtain such information as the Secretary may describe in such order concerning—
> (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and
> (B) any other person participating in such transaction;
> (2) to maintain a record of such information for such period of time as the Secretary may require; and
> (3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

2

31 U.S.C. § 5326(a). By these plain terms, the GTO statute authorizes the Secretary to issue a GTO to "obtain such information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . , the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id.*

The only prerequisite is that the Secretary find "reasonable grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[2] *Id*. A GTO may then be effective for no more than 180 days unless renewed. *Id.* § 5326(d). The Secretary's authority to issue a GTO has been delegated to the Director of FinCEN. *See* U.S. Dep't of Treasury, Treasury Order 180-01 (Jan. 14, 2020), https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-180-01. FinCEN has issued regulations which further govern the form of such GTOs. *See* 31 C.F.R. § 1010.370. Additionally, pursuant to 31 U.S.C. § 5318(a)(7), FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its implementing regulations, including requirements imposed by a GTO. *See also* 31 C.F.R. § 1010.970 (further describing this exemptive authority).

On March 10, 2026, FinCEN issued the GTO at issue in this case, which covers MSBs operating in portions of four counties in Arizona, five counties in Texas, three counties in New Mexico, and certain ZIP codes in California (a total of 11 ZIP codes). *See* Geographic Targeting Order Imposing Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 91 Fed. Reg. 11456 (Mar. 10, 2026); *see also* Compl. ¶ 32, ECF No. 1. MSBs are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters. *See generally* 31 C.F.R. § 1010.100(ff). The GTO took effect on March 7, 2026.

---

[2] The purposes of this particular subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions. *See* 31 U.S.C. § 5311.

26-cv-02389-KML

Under this GTO, covered MSBs must submit reports, using the CTR form, within 30 days for currency transactions involving between $1,000 and $10,000 to capture certain transactions that would otherwise fall below the CTR monetary threshold of $10,000. 91 Fed. Reg. at 11456-57. A covered MSB is also required to verify the identity of the customer, leveraging the verification process for currency transactions of $10,000 or more. *Id* at 11457. To assist covered businesses, FinCEN published FAQs on their website. *See* FinCEN, Frequently Asked Questions ("FAQs") (Mar. 19, 2026), https://www.fincen.gov/system/files/2026-03/SWB-GTO-FAQs.pdf. The FAQs confirm that, other than the applicable amount and a code unique to the GTO, these required CTRs generally follow the same form and content as those already required for currency transactions exceeding $10,000, and are to be filed in the same way. *See, e.g.*, FAQ Items 3, 8 (noting that "[t]he GTO does not alter any existing BSA obligation of Covered Businesses (as defined in the GTO), except as otherwise noted in the order itself"; and that the only changes noted in the GTO are that "Covered Businesses are required to report transactions of more than $1,000 but not more than $10,000, and must record the term 'MSB0326GTO'").

The challenged GTO differs in several respects from the March 2025 and September 2025 iterations of GTOs targeting the Southwestern border region. The challenged GTO, like the September 2025 iteration, raised the reporting threshold to $1,000 and extended the filing deadline from 15 days to 30 to mitigate the burden on MSBs while still meaningfully addressing cash-based money laundering along the southwest border. *See* Exh. 1, Decl. of Andrea Gacki, ("Gacki Decl."), ¶ 12. The challenged GTO also expands the geographic area covered by the GTO by adding two additional counties in Arizona (covering MSBs in Maricopa and Pima Counties) and adding three additional counties in New Mexico (covering MSBs in Bernalillo, Doña Ana, and San Juan Counties). *Id.* The challenged GTO also excludes MSBs who obtained an injunction against enforcement of prior iterations of the GTO in other jurisdictions. *Id.*

26-cv-02389-KML

As Plaintiff acknowledges, *see* Compl. ¶¶ 19, 21, 25, 27, MSBs are subject to a range of legal requirements and internal policies that pre-date the GTO, including registering with FinCEN, filing CTRs, developing and maintaining an effective AML program, filing suspicious activity reports, and maintaining detailed records. *See* AR Mem. at 3-4 (collecting regulations). Other regulations require verification of identity for specific types of transactions. *See, e.g.*, 31 C.F.R. § 1010.312. Plaintiff also acknowledges that they sometimes collect customer information for transactions below $3,000 on their own, but that information is not as detailed as the information required for a CTR. *See* Compl. ¶ 30.

### III.    LEGAL STANDARD

To prevail on a motion for a preliminary injunction, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff must demonstrate a "substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). When "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* factors]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted).

The final two factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—merge when the Government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has specifically acknowledged that "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte v. United States*, 470 U.S. 598, 611 (1985); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975); *Maharaj v. Ashcroft*, 295 F.3d 963, 966 (9th Cir. 2002) (movant seeking injunctive relief "must show either (1) a probability of success on the merits and the possibility of irreparable harm, or (2) that serious legal questions are raised and the balance of hardships tips sharply in the moving party's favor.") (quoting *Andreiu v. Ashcroft*, 253 F.3d 477, 483 (9th Cir. 2001)).

## IV.    ARGUMENT

### A. Plaintiff Fails to Establish a Likelihood of Success on the Merits.

Kiosko must establish "that [it] is likely to succeed on the merits," *Winter*, 555 U.S. at 20, but the Ninth Circuit has formulated and adopted the "serious questions" test wherein a party can demonstrate a likelihood of success on the merits where there are "'serious questions going to the merits[.]'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024). This alternate "serious issues" test may be less demanding, but it "does not erase the Supreme Court's admonition that an injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (cleaned up), (quoting *Winter* 555 U.S. at 22). A "serious question does not exist where the plaintiff's claim is merely plausible or just because there are legal questions not directly answered by past precedent." *Id.* (citation modified) (district court erred in applying "serious questions" standard and granting injunction).

### 1.    Reporting Requirements Do Not Violate the Fourth Amendment.

Plaintiff has not demonstrated serious questions going to the merits of their Fourth Amendment claim that warrant a preliminary injunction. In arguing that the GTO is a "general warrant," Plaintiff gives short shrift to the key precedent on the Fourth Amendment and financial reporting requirements, the Supreme Court's decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974).

*Shultz* involved a Fourth Amendment challenge to the general nationwide reporting requirement for transactions in currency of more than $10,000 pursuant to regulation enacted under the authority of the BSA. Among the challenged BSA provisions in *Shultz* was a requirement that banks make "certain reports of domestic transactions [to the government] where such reports have a high degree of usefulness in criminal, tax, or regulatory investigations." *Id.* at 30-31, 37.[3] For each covered transaction, the BSA

---

[3] The regulation also exempts financial institutions from reporting requirements for transactions between the institution and an "exempt person," which includes an

required the bank to disclose "the name, address, business or profession and social security number of the person conducting the transaction," among other information. *Id.* at 39 n.15. Congress created these "precise and detailed reporting requirements," *id.* at 27, to address "the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade" U.S. law., *id.* at 38; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions.").

The Supreme Court concluded that these BSA reporting requirements were reasonable and fully consistent with the Fourth Amendment. As a starting point, the Court affirmed the principle that "'neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret.'" *Id.* at 65, 66-67 (*United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). As incorporated or unincorporated associations, the Federal Government allows business associations, like MSBs, "the privilege of acting as artificial entities" and "the privilege of engaging in interstate commerce," and in return MSBs submit to "an enhanced measure of regulation" wherein the government retains "a legitimate right to satisfy [itself] that corporate behavior is consistent with the law and the public interest." *Id.* at 66 (citations omitted). The Court then analyzed whether the reporting requirement was unreasonable such that it would run afoul of the Fourth Amendment. The Court's analysis focused on extant corporate reporting requirements, such that the reporting requirement imposed by the regulation would impose no greater burden on financial institutions than that which an institutions' own recordkeeping practices might subject them. The Court held that the reporting requirement was not unreasonable and not unconstitutional for two primary reasons: the information required to be reported was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of

---

"established customer maintaining a deposit relationship with the bank, in amounts which the bank may reasonably conclude do not exceed amounts commensurate with the customary conduct of the business, industry or profession of the customer concerned." *See Shultz*, 416 U.S. at 59; *see also* 31 C.F.R. § 103.22(d).

7

26-cv-02389-KML

transactions of that type in interstate commerce," such that the BSA "d[id] not impose unreasonable reporting requirements" under the Fourth Amendment. *Id.* at 67.

*Shultz* establishes the proper Fourth Amendment rubric applicable to the GTO, which takes a similar form and arose under similar circumstances. Just like the reporting in *Shultz*, the GTO requires companies to "file reports dealing with particular phases of their activities." *Id.* at 65. Like the reporting requirements challenged in *Shultz*, the GTO was motivated by increasing use of covered entities for illicit purposes as the GTO itself plainly states: "[t]his action is being taken in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States. 91 Fed. Reg. at 11456.

The barest glance at *Shultz* disproves Plaintiff's Fourth Amendment claim, as the Supreme Court repeatedly explained that the BSA arose because of "the heavy utilization of our domestic banking system by the minions of organized crime." *Shultz*, 416 U.S. at 30; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions."). As the Supreme Court recognized, Congress determined that the BSA's reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38.

Consistent with *Shultz*, Congress routinely enacts other reporting requirements, including as to information used for law enforcement purposes. For example, federal law requires employers to collect and make available information about new employees' eligibility to work. *See* 8 U.S.C. § 1324a(b) (employment verification reporting requirements); *id.* § 1324a(f) (criminal penalties). Political campaigns are required to report contributions and expenditures. *See* 52 U.S.C. § 30104; *id.* § 30107(a)(9) (FEC may "report apparent violations to the appropriate law enforcement authorities"). Taxpayers, of course, are required to file tax returns. *See* 26 U.S.C. § 6012. Plaintiff has identified no authority casting Fourth Amendment doubt on such reporting enactments.

26-cv-02389-KML

Plaintiff's insistence that the border GTO operates as a general warrant, Plaintiff's Motion for Preliminary Injunction ("Mot.") at 10:17-18, ECF No. 30, simply cannot be squared with *Shultz* or with the many other statutory reporting requirements that have long been understood as constitutional. The requirements for a warrant or a certain level of suspicion Plaintiff seeks to import into cases involving statutory reporting schemes come from—and are applicable to—cases involving discretionary and often physical searches. In cases where agencies or officers have discretion to control the timing, manner, scope, and frequency of individual searches, an opportunity for pre-compliance review may mitigate any risk of abuse or harassment. *See Brock v. Emerson Elec. Co.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (differentiating cases "involv[ing] discretionary and potentially arbitrary requests for document inspection," where a subpoena may be required, with "cases in which businesses or individuals are required to report particular information to the government on a regular basis," like *Shultz*).

For instance, Plaintiff relies on *City of Los Angeles v. Patel*, (Mot. at 12:7-19), which concerned on-demand "inspections" by city police of hotel guest records that hotels were required by city code to maintain. 576 U.S. 409, 412-14 (2015). The Supreme Court required pre-compliance review in that case because of a "risk that searches … will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests," such as a hotel being "searched 10 times a day, every day, for three months." *Id.* at 421; *see also id.* at 423 ("[T]he availability of precompliance review … reduces the risk that officers will use these administrative searches as a pretext to harass business owners.").

Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz*. *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994-95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan*

26-cv-02389-KML

*v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant"). This distinction is present in *Shultz* itself. *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not authorize indiscriminate rummaging among the records of the plaintiffs").

Here, the GTO requires reporting of specific information under specific statutory criteria, rather than providing field officers with leave to conduct limitless, discretionary searches of Plaintiff's files or the persons of its owners and employees. *See* 31 U.S.C. § 5326; 91 Fed. Reg. at 11457. Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment or abuse present in *Patel* and similar cases. In *Shultz*, the Supreme Court already determined what Fourth Amendment analysis is applicable to statutory reporting requirements, and the GTO is both reasonable and constitutional under those principles.

### 2.  The GTO Is Not Subject to "Notice and Comment" Requirements.

Plaintiff argues that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a). But the statute pursuant to which the GTO was issued only authorizes FinCEN to proceed by order. Thus, the challenged agency action is not a rule and is therefore not subject to the rulemaking requirements of the APA. *See* 91 Fed. Reg. 11456.

The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). The GTO is fundamentally investigatory rather than legislative in nature; it is limited in scope and time and tied to specific facts found by the agency in this geographic area. *Cf. United States v. W. H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports

to the Secretary of Agriculture was not subject to rulemaking requirements).

Most importantly, Congress specifically authorized the agency to act by order rather than by rule here. 31 U.S.C. § 5326(a) ("The Secretary may issue an order . . ."). That is in sharp contrast to the statutory provision governing, for instance, CTRs, which generally requires the Secretary to set the reporting threshold "by regulation" rather than by order. *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with id.* § 5326 (authorizing the Secretary to act by order, including setting the applicable amount of reportable transactions in a GTO).

This reading of the statute is buttressed by the purposes of a GTO—to target a specific threatened geographic area for a time-limited period. *Id.* § 5326 (d). GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of a GTO for FinCEN to issue the order, and it could not be used effectively to respond to dynamic threats, develop financial intelligence, and uncover illicit activity. Finally, notice-and-comment rulemaking is not required simply because the GTO affects a group of businesses. *See Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment." (citation omitted)); *Nat'l Biodiesel Bd. v. Env't Prot. Agency*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) ("[T]he fact that an agency action applies to a 'large number of [parties]' 'carr[ies] [little] weight' in [the Court's] analysis." (third & fourth alteration in original) (citation omitted)). In any event, the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

### 3.   5 U.S.C. § 559 Is Inapplicable.

The statute cited by Plaintiff is not relevant to the interpretation of 31 U.S.C. § 5326. *See* 5 U.S.C. § 559. Section 559 provides that a subsequent statute may not be held to

26-cv-02389-KML

supersede or modify the procedural requirements of the APA unless the statute does so in express terms. The BSA, in Section 5326, permits the Secretary of the Treasury to issue orders. 31 U.S.C. § 5326(a). An order, as defined by the APA, "means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rulemaking but including licensing." 5 U.S.C. § 551(6). The GTO falls squarely within the scope of this definition. As such, the statute need not displace notice-and-comment requirements because orders, under the APA, are not subject to notice-and-comment. Section 5326(a) provides that the Secretary of the Treasury may, on their own initiative or at the request of law enforcement, evaluate whether "reasonable grounds exist" for imposing additional, temporary recordkeeping and reporting requirements on a particular business or targeted group of businesses and issue an order imposing such requirements. The Secretary's evaluation is a "matter other than rulemaking" and the order is the resulting final disposition. As such, 31 U.S.C. § 5326 need not override any procedural requirement of the APA as none applies. Therefore, 5 U.S.C. § 559 is not relevant or applicable here.

### 4. The GTO Is Not "Arbitrary and Capricious."

An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99 (1977). This means that a court's standard of review is "narrow" and may assess only whether the "agency, 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)

26-cv-02389-KML

(citation omitted). In so reviewing, "'a court is not to substitute its judgment for that of the agency' and should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]'" *Id.* at 513-14 (citations omitted).

Far from being "arbitrary and capricious" in violation of the APA, the GTO is reasonable and the agency considered all relevant factors in issuing it. The GTO itself reflects the agency's reasonable finding that the additional recordkeeping and reporting requirements set forth in the GTO "are necessary to carry out the purposes of the BSA or to prevent evasions" and further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States." 91 Fed. Reg. at 11456. This finding is further buttressed by analysis in the GTO Memorandum. Information Memorandum for Director Andrea M. Gacki (Feb. 26, 2026), ECF No. 24-1 ("GTO Memorandum").[4] Surveying the information available, FinCEN found that MSBs along the southwest border are uniquely vulnerable to money laundering activities by drug cartels that use both witting and unwitting MSBs as part of various illegal schemes to transport and launder drug money. *See* GTO Mem. at 5-9. FinCEN assessed that "MSBs along the southwest border are subject to unique money laundering vulnerabilities, doing business in a region where drug cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash domestically and across the border." *Id.* at 6. FinCEN further found that the

> [southwest border] GTO reports would generate new leads and identify new and related subjects in ongoing cases, enabling, for instance, the identification of comprehensive networks of potential money mules or the identification of professional money launderers. The reissuance of the [southwest border] GTO would also support investigations into MSBs themselves that may be complicit in supporting illicit activity or maintain poor [anti-money laundering/countering the financing of terrorism] controls that would leave them vulnerable to exploitation by illicit actors.

---

[4] Per the Court's May 8, 2026 Order (ECF No. 29), Defendants have sought leave to file a version of the GTO Memorandum with all portions pertaining to Maricopa County unredacted under seal. ECF No. 34. If it would aid the Court's resolution of Plaintiff's motion, Defendants are prepared to file the administrative record for the challenged GTO, subject to appropriate protections for sensitive law enforcement information.

26-cv-02389-KML

*Id.* at 17. FinCEN gave careful and comprehensive consideration of all relevant factors in its decision to issue the GTO, which is entitled to this Court's deference. As discussed below, Plaintiff's proffered reasons suggesting that the GTO is "arbitrary and capricious" all fail.

### a. *Expansion to Maricopa County Was Not Arbitrary*

The GTO Memorandum explains that the specific ZIP codes and counties the GTO targets were selected based on express concerns raised by law enforcement as well as risk factors that include their relative proximity to the border and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes. GTO Mem. at 7-11, 19-24. FinCEN also noted that Pima and Maricopa Counties specifically were "part of a designated High Intensity Drug Trafficking Areas (HIDTAs)" and these counties were included in the current GTO in response to a law enforcement request. *Id.* at 19. "In a letter to FinCEN, [the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) division] [in] Nogales, Arizona requested the expansion of the SWB GTO to Tucson and Phoenix." *Id.* at 20 (footnote omitted). This letter states that the "Southwest Border of the United States has seen a significant rise in illicit financial activity tied to drug trafficking, human smuggling, and weapons trafficking" and that "[c]riminal organizations are increasingly exploiting vulnerabilities in the financial system to move bulk cash . . . across the border." *Id.* at 20. The letter further states that the benefits of expanding the GTO to Pima and Maricopa Counties would include "disrupting illicit financial flows," "improving intelligence," and "supporting border security." GTO Mem. at 21 (footnote omitted).

FinCEN further notes that the HIDTA that includes Maricopa and Pima counties "is a major arrival zone for multi-ton quantities of fentanyl, methamphetamine, heroin, and cocaine entering the United States from Mexico." *Id.* at 20. That cartels might attempt to launder drug proceeds through MSBs in the major metropolitan areas that also serve as entry points into the United States for significant quantities of illicit drugs does not require

26-cv-02389-KML

a significant logical leap. The inclusion of Maricopa County cannot be deemed arbitrary, as Plaintiff suggests, simply because FinCEN did not meet the ultra-specific criteria with respect to BSA reports that Plaintiff lays out in its motion.

### b. The $1000 Transaction Threshold Is Not Arbitrary.

FinCEN set the GTO reporting threshold at $1,000 "to detect structured transactions attempting to evade the [$10,000] reporting threshold[.]" GTO Mem. at 26. FinCEN retained the $1,000 reporting threshold for this GTO—which had been adjusted above the $200 threshold of the original March 2025 iteration—because it found that that amount "strike[s] a more appropriate balance in ensuring that the reports filed would be most useful to law enforcement, while limiting burden on Covered Businesses." *Id.* at 24.

In setting the $1,000 threshold, FinCEN also considered the reporting requirements to which MSBs were already subject before issuing the GTO. Every MSB must register with FinCEN (with limited exceptions) and is subject to the following reporting and recordkeeping requirements:

- All MSBs must file reports—using a CTR form—for cash currency transactions, or multiple transactions, totaling more than $10,000 in a single day by a single person, *see id.* at 3-4;

- All MSBs that know, suspect, or have reason to suspect that a transaction or pattern of transactions is relevant to a possible violation of law or regulation and involves funds or other assets of at least $2,000 must electronically file a Suspicious Activity Report (SAR) with FinCEN, *see id.* at 5;

- All MSBs are required to verify customer identities and retain certain records with respect to transmittals of funds for $3,000 or more purchases of bank checks or drafts, cashier's checks, money orders, or traveler's checks for $3,000 or more in currency, and prepaid access, *see id.* at 5; and

- All MSBs that exchange foreign currencies must keep records of each exchange over $1,000, including details about the specific exchange as well as the

15

transacting customer's name, address, and, in most instances, a passport or tax identification number, *see id.* at 5.

In light of these preexisting requirements, FinCEN set the $1,000 threshold low enough to capture cash transactions that are "most vulnerable to abuse by drug cartels" and that are structured to evade these preexisting reporting requirements—CTRs, SARs, and the $3,000 identification verification requirements—while limiting the compliance burden on MSBs. *See id.* at 24.

### c.  *Cartel Countermeasures Were Considered.*

FinCEN also considered that drug cartel members might modify their criminal activities in response to the GTO. Contrary to Plaintiff's assertion that FinCEN did not consider that cartels could relocate their cash smuggling activities to non-targeted counties or states, Mot. at 17, the GTO Memorandum demonstrates that FinCEN did consider this factor and explains how it will address it. FinCEN considered that "due to its deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity." GTO Mem. at 19.

> FinCEN and its law enforcement partners will monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered . . . [and] [b]ased on the results of this analysis, FinCEN may expand or otherwise modify the geographic scope of this order to cover MSBs in additional geographic areas in any future issuances.

*Id.* As further evidence that countermeasures were considered, FinCEN took into account that any effort cartels employed to evade the GTO's reporting requirements would make it more difficult for cartels to launder illicit proceeds by making it more costly to do so or by exposing cartel-linked transactions to a higher risk of detection. *See* Gacki Decl., ¶ 26.

### d.  *FinCEN's Ability to Utilize the Information Generated by the GTO.*

Plaintiff also argues that FinCEN will be unable to act on all the intelligence the GTO generates and claims, without any support whatsoever, that previous iterations of the GTO and the over-700,000 reports it generated produced no benefit to law enforcement.

16

26-cv-02389-KML

*See* Mot. at 17. The GTO Memorandum and attached declaration directly contradict Plaintiff's unsupported claims.

FinCEN is already using the data generated by previous iterations of the GTO to make referrals to national and local law enforcement. GTO Mem. at 18; Gacki Decl. ¶ 18. This data has helped FinCEN issue alerts to law enforcement regarding potential instances of money laundering through MSBs and their agents operating along the southwest border. GTO Mem. at 18; Gacki Decl. ¶ 18. FinCEN is also currently using GTO data to conduct network analyses of MSB activity in the areas currently subject to the GTO. GTO Mem. at 18. As a result, FinCEN has "identified a substantial amount of anomalous financial activity and money laundering indicators through its analysis of funds funneled through MSBs[.]" GTO Mem. at 18; *see also* Gacki Decl. ¶ 18. Moreover, previous iterations of the GTO are strongly supported by federal law enforcement agencies that have already confirmed the usefulness of the information they generate. *See* GTO Mem. at 18; Gacki Decl. ¶ 19.

In addition to generating actionable intelligence about cartel-related money laundering, imposing these temporary recordkeeping and reporting requirements would disrupt cartel activity by making it more difficult for cartels to structure transactions to avoid detection. *See* GTO Mem. at 17, 21-22. Although its effect is temporary, the GTO itself frustrates criminal activity by increasing the cost, and decreasing the ease, of doing business for cartels, *id.*; Gacki Decl., ¶ 23-26, further justifying FinCEN's decision to issue the order.

### e. FinCEN Considered the Impacts of the GTO on MSBs.

Plaintiff accuses FinCEN of a "wholesale failure to consider the GTO's impact on legitimate businesses." Mot. at 18. The GTO Memorandum and attached Declaration clearly demonstrate that FinCEN fully considered the impacts of the GTO on MSBs in the covered areas and suggests that those impacts are not as dire as Plaintiff would have the Court believe.

26-cv-02389-KML

First, the GTO Memorandum analyzed the submission of reports pursuant to the March 2025 and September 2025 versions of the GTO and determined that "the vast majority of reports submitted under the SWB GTO are being submitted by large, sophisticated companies that are likely well-situated to implement the terms of the SWB GTO without significant burden or disruption to their operations." GTO Mem. at 25. Therefore, Plaintiff is part of a small minority of businesses that file a limited number of reports that FinCEN determined constitutes a "*de minimus* burden." *Id.*

Second, FinCEN properly concluded that the burdens on MSBs are, at most, *de minimus*. As explained above, all MSBs are already subject to a number of reporting requirements that overlap with the GTO. *See also* Gacki Decl. ¶ 27 (explaining the $3,000-threshold reporting requirement for certain funds transfers and purchases of bank checks and drafts, cashier's checks, money orders, and traveler's checks and the $1,000-threshold reporting requirement for foreign currency exchange transactions). Furthermore, FinCEN has made the submission of reports fully electronic, flexible, and streamlined. *See* Gacki Decl. ¶ 28-29. As such, FinCEN estimated that reports using the CTR form "take roughly eight minutes to complete (an average of ranges from 3.24 minutes to over 20 minutes per CTR depending on filing method)." Gacki Decl. ¶ 32.

### 5. The GTO is not *Ultra Vires* and is Fully Authorized by Statute.

Plaintiff argues that the GTO is *ultra vires* because it exceeds the agency's authority under 31 U.S.C. § 5326(a).

As an initial matter, *ultra vires* review is unavailable to Plaintiff here. *Ultra vires* review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bhd. of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)). *Ultra vires* review is "also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (quoting *Bd. of Governors of Fed.*

18

*Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Here, Plaintiff has "dress[ed] up a typical statutory-authority argument as an ultra vires claim" and it does not fall within the strictly limited scope the Supreme Court has established for *ultra vires* review. *Id.* at 682. *Ultra vires* review is unavailable to Plaintiff here for two easily discernible reasons: (1) the agency has not exercised powers contrary to a "*specific prohibition* in statute" and (2) Plaintiff has a "meaningful and adequate opportunity for judicial review" of the GTO under the APA. *See id.* at 681 (citation modified). Plaintiff's *ultra vires* claim fails on this basis alone. Nevertheless, none of Plaintiff's arguments that FinCEN has exceeded its authority are convincing.

As to Plaintiff's first argument that the GTO is *ultra vires*, Plaintiff suggests that the reporting requirement imposed by the GTO is broader than that contemplated by the authorizing statute. *See* 31 U.S.C. § 5326. Plaintiff claims that the authorizing statute only allows "limited information-gathering requirements directed [at] particular businesses (or groups of businesses) in the context of particular agency investigations, based on particularized facts." Mot. at 18. But Plaintiff's reading of Section 5326(a) is far narrower than what the statute plainly says. Under Section 5326(a), a geographic targeting order may cover "any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." The statute contains none of the limiting language that forms the basis of Plaintiff's claim. That a GTO must derive from "particular agency investigations" or "particularized facts" have no basis in the text of Section 5326(a). Quite straightforwardly, the "money services business[es]" located in the twelve counties—including Maricopa and Pima counties in Arizona—and the eleven ZIP codes in California, 91 Fed. Reg. at 11,456-57, make up a "group of domestic financial institutions" in a defined "geographic area[.]" 31 U.S.C. § 5326(a). The Court should not read the statute, as Plaintiff has, to mean that the agency may only impose reporting requirements on multiple businesses if "particularized facts" or a "particularized agency investigation" as to each individual business or group of businesses to justifies the need for reporting. Congress has not narrowed the scope of

19

FinCEN's GTO authority in this way. *See Babb v. Wilkie,* 589 U.S. 399, 413 (2020) ("[W]here, as here, the words of [a] statute are unambiguous, the judicial inquiry is complete." (second alteration in original) (citation modified)).

Plaintiff also suggests, without any explanation, that the scope of the authority provided in Section 5326(a) is somehow limited by the Supreme Court's decision in *United States v. Morton Salt Co.*, a case that pre-dates the Bank Secrecy Act by two decades and the Anti-Drug Abuse Act of 1988 (which initially created Section 5326) by nearly four. *See* 338 U.S. 632 (1950). In any event, the Supreme Court in *Morton Salt* ultimately upheld the government agency's reporting requirement in that case because "the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant." *Morton Salt*, 338 U.S. at 652-53.

Plaintiff's textual arguments similarly fall flat. Plaintiff states without further explanation that an "order" can only result from an "adjudication" and there has been no adjudication here. Mot. at 18 (citation omitted). As defined by the APA, "adjudication" is an "agency process for the formulation of an order." 5 U.S.C. § 551(7). Although Plaintiff fails to provide any explanation as to why the process for issuing the challenged GTO is *not* an adjudication under the APA's definition, it is clear that the operative definition is quite broad on its face. Read together with the definition of "order" that precedes it, "adjudication" encompasses *any* agency process other than rulemaking. *See id.* § 551(6); *see Yesler v. Terrace Cmty. Council v. Cisneros,* 37 F.3d 442, 448 (9th Cir. 1994) ("An adjudication (which results in an order) is virtually any agency action that is not rulemaking.").

Plaintiff also argues that the GTO is not an "order" within the meaning of 31 U.S.C. § 5326 because it must identify and target an individual business or group of businesses. Mot. at 19. The drafters of the Bank Secrecy Act deliberately incorporated the APA's use of the term "order" in authorizing the Secretary to impose additional reporting requirements. When they incorporated the term they "br[ought] the old soil with it"—that is, made plain that notice and comment is not required for geographic targeting orders that

20

meet Section 5326(a)'s requirements. *See George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Loretzen*, 587 U.S. 554, 560 (2019)). In other words, when the "Secretary of the Treasury finds . . . that reasonable grounds exist for concluding" that it would serve the purposes of the Act to require "any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in geographic area" to report "any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds," the action that results is an "order," 31 U.S.C. § 3526(a), not a "rule."

Other textual indicia confirm the conclusion that the Act's drafters intended a reporting obligation binding a "domestic financial institution . . . or group of domestic financial institutions" under Section 5326(a) to be an order, not a rule. *See Feliciano v. Department of Transp.,* 605 U.S. 38, 48-50 (2025). The next subsection in the statute, which grants the Secretary authority to demand reports from depository institutions, permits him to proceed "by regulation or order," 31 U.S.C. § 5326(b). Other nearby provisions authorize the agency to act only by "regulation." *See id.* § 5313(a) (BSA provision authorizing the Secretary to "prescribe[] by regulation" a generally applicable currency transaction reporting requirement); *id.* § 5314(b) (foreign bank and financial account reporting statute) (repeatedly referring to "regulation[s] under this section"). "Congress has shown that it knows how to adopt" a term requiring rulemaking, a step it did not take in Section 5326(a). *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (citation omitted). Furthermore, subsection (c) of the statute mandates that, unless waived by the agency, the existence of an order is to be kept confidential. 31 U.S.C. § 5326(c). That provision would be entirely without force if the agency were required to conduct public notice-and-comment rulemaking in order to issue a targeting order. That anomalous result counsels strongly against treating a targeting order as a legislative rule that would require notice and comment. *See Dept. of Agric. Rural Dev. Rural Hous. Serv. V. Kirtz,* 601 U.S. 42, 53 (2024).

The "context from which the statute arose," *Bond v. United States*, 572 U.S. 844,

860 (2014), provides further support for the textual evidence that by using the term "order," Congress meant to remove the tool it was providing to the agency—which it intended to be flexible and meaningful—from the APA's more stringent procedural requirements for rulemaking. *See* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021) ("The mischief rule instructs an interpreter to consider the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem. Put another way, the generating problem is taken as part of the context for reading the statute." (footnote omitted)).

As described above, the geographic targeting authority came into existence almost 20 years after Congress provided for the establishment of the general $10,000 reporting obligation. *Supra* p. 2. Section 5326(a)'s enactment recognized the occasional need to mandate time-limited reporting "in a geographic area," so as to gather location-specific information in emergent situations—conditions precisely like those underlying the promulgation of the challenged GTO. This conclusion is strengthened by the fact that when the statute was enacted, a geographic targeting order was limited to 60 days (later extended to the current 180).[5] It strains credulity to imagine that Congress intended use of that tool to be subject to rulemaking procedures that can last months.

> The gestation period from initial notice to final rule can be a couple of months, and often much longer depending on the time the agency allows for comments and the time it takes to digest those comments. In addition to the time required for the notice and comment procedures to run their course, an additional thirty days ordinarily must pass between the time the final rule is published and the time it takes effect.

*Riverhead Farms, Inc. v. Madigan,* 958 F.2d 1479, 1484 (9th Cir. 1992). The result would obviate much of the utility the geographic targeting tool was created to afford to the Executive Branch.

More broadly, Congress' described the information to be gathered through GTOs as "highly useful in . . . criminal, tax, or regulatory investigations, risk assessments, or

---

[5] The USA Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, extended the maximum period of an order to 180 days. USA Patriot Act, § 353, 115 Stat. at 323.

22

proceedings, or . . . intelligence or counterintelligence activities, including analysis, to protect against terrorism," 31 U.S.C. § 5311(1), which underscores the need to obtain the reported information quickly and counsels against treating a targeting order as a rule for which public notice-and-comment rulemaking is required. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)).

The result of FinCEN's action here was an APA order, because it complies with the terms of the statute. By using the term "group," Congress permitted FinCEN to act with respect to "a number of individuals assembled together or having some unifying relationship or action," *Group*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/group (last updated May 18, 2026). Here, the "individuals" are particular "domestic financial institutions," *i.e.*, money services businesses, sharing the "unifying relationship or action" of doing business in a limited number of narrowly defined "geographic area[s]," 31 U.S.C. § 5326(a). Those geographic areas—the twelve counties and eleven ZIP codes—meet the relevant regulatory definition. *See* 31 C.F.R. § 1010.370(d)(4) ("For purposes of this section, the term *geographic area* means any area in one or more States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, the Trust Territory of the Pacific Islands, the territories and possessions of the United States, and/or political subdivision or subdivisions thereof, as specified in an order issued pursuant to paragraph (a) of this section.").

None of Plaintiff's remaining arguments support a finding that FinCEN's issuance of the GTO challenged here is *ultra vires*. FinCEN has issued several GTOs in the past that targeted a large number of businesses or focused on limited geographic areas, similar to this GTO. *See* Gacki Decl. ¶ 7 (describing geographically based GTOs targeting the New York City metropolitan area, the Los Angeles fashion district, and the Miami metropolitan area electronics export trade); *see also id.* ¶ 8 (describing geographically

based GTOs targeting residential title insurance companies). Like these previous GTOs, the current GTO targets specific businesses or trades (*i.e.*, MSBs) within a limited geographic area that affects a large number of entities.

### B. Kiosko Asserts Only Weak and Avoidable Irreparable Harm.

A plaintiff seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The proffered irreparable harm must not be speculative. *See Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984). Defendants acknowledge that the GTO imposes some burdens on MSBs within its scope. *See* Gacki Decl. ¶¶ 27-32. Plaintiff has likewise submitted evidence that it will incur some costs to comply with the GTO. But the estimates of those costs appear to be exaggerated, and Kiosko could reduce those burdens by using automated alternatives like automated batch-filing. *Id.* ¶ 32.

As a baseline, the Paperwork Reduction Act (PRA) notice cited by Kiosko estimates that a CTR takes an average of eight minutes to complete, with averages ranging from 3.24 minutes to over 20 minutes per CTR depending on filing method. *See* Mot. at 4 (citing Agency Information Collection Activities, 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024) and Agency Information Collection Activities, 85 Fed. Reg. 29,022, 29,029 (May 14, 2020)). Notably, many non-depository institutions like MSBs use automated batch filing, and for them, the average time per CTR is estimated at 4.76 minutes per CTR. 85 Fed. Reg. 29,029.

Ms. Ruiz acknowledges the possibility of using software to batch file CTRs, but dismisses the option based on time and expense. *See* Decl. of Andrea Ruiz Decl. ¶¶ 38-40, ECF No. 30-1. Although acknowledging that such systems "may assist with data storage or filing," Ms. Ruiz asserts they "do not significantly reduce transaction time." *Id.* ¶ 38. Ms. Ruiz's estimates, however, appear to be based on the time to input a new customer and do not account for efficiencies from repeat business. *Id.* Once a customer's information is saved in the software, future transactions would be significantly streamlined. And her speculative estimates about transaction times for software Kiosko has not used, *see id.* ¶ 38 (estimating 10-15 minutes solely to collect information from first-time customers) are

inconsistent with the real-world averages FinCEN compiled about non-depository institutions like MSBs, 85 Fed. Reg. at 29,029 (4.76 minutes average for collection and filing of information). It is unclear what data Ms. Ruiz used to estimate between 10 to 18 minutes for her to file CTRs, but that timing appears to be premised on discrete, nonautomated filings. At a minimum, Kiosko's decision not to implement batch-filing software to reduce transaction times for its repeat customers is inconsistent with its protestations that it will lose repeated business. *See* Ruiz Decl. ¶ 26. None of these expenses appear to be so financially ruinous that they threaten the viability of Ms. Ruiz's business. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). And the GTO itself adds only a modest new burden. Federal law already required Kiosko to collect customer information for transactions involving $3,000 or more. *See* Compl. ¶¶ 25-26. The GTO merely lowers that threshold to $1,000 for certain transactions and requires certain additional lower dollar transactions to be reported.

Kiosko also claims that it will suffer "loss of goodwill" by complying with the GTO. Mot. at 8. But nowhere does it explain why *its* goodwill would be harmed relative to other MSBs that also must comply with the GTO. Nor has Kiosko established that any of its customers will be irretrievably lost. Ms. Ruiz instead merely expresses fears that Kiosko's customers "may never return." Ruiz Decl. ¶ 26. However genuinely felt, these anxieties are insufficient to foresee "likely," irreparable harm. *Winter*, 555 U.S. at 20.

Ms. Ruiz also attests that some of Kiosko's customers have told her "that they went elsewhere (like to credit unions or banks) because those places do not ask for intrusive personal information." Ruiz Decl. ¶ 25.[6] It is unclear, however, whether the number of these customers is remotely significant. *See id.* Indeed, banks and credit unions are "subject to additional regulatory requirements beyond what is required of MSBs" related to obtaining information about their customers' identities. *See* GTO Mem. at 28. Banks,

---

[6] To be clear, Defendants do not dispute that some customers in fact made the described statements to Ms. Ruiz. *Cf. infra* pp. 28-30 (arguing that there are no disputes of fact that need be resolved at an evidentiary hearing).

26-cv-02389-KML

moreover, "typically provide services only to [existing] customers" and "charge a higher fee than would an MSB" when they do provide services to the broader public. *Id.* And Kiosko provides no evidence that potential customers have responded to the minutes of increased transaction times attributable to the GTO by taking potentially hours to drive to another county outside the order's geographic scope. *Contra* Mot. at 9.

Kiosko argues that its compliance costs are irreparable because sovereign immunity might preclude a damages award against the government. Mot. at 9. It cannot be, however, that any compliance cost from a regulation suffices—given the widespread existence of costs to comply with federal regulation, the result would contradict the Supreme Court's repeated admonition that a preliminary injunction cannot flow from a showing of likelihood of success on the merits alone. *E.g.*, *Winter*, 555 U.S. at 32; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). Irrespective of sovereign immunity, Kiosko has not shown that the GTO "will cost it substantial sums" and has therefore not established entitlement to a preliminary injunction. *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1319 (D. Ariz. 2015).

As a final effort to establish irreparable harm, Kiosko argues that constitutional violations are *per se* irreparable. *See* Mot. at 8-9. That argument works only if Kiosko has established it is likely to succeed on the Fourth Amendment claim pressed in its motion. For the reasons explained above, it has not. Any compliance burden posed by a financial transaction reporting requirement, moreover, is simply not comparable to indefinite detention, as in the case Kiosko cites. *See Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

### C. The Balance of Equities and Public Interest Favor Defendants.

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Any preliminary relief should be

26-cv-02389-KML

carefully tailored to address only the harms that a plaintiff has established. 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2947 (3d ed. Apr. 2026).

In the face of Kiosko's weak evidence of harm that could be partially avoided through technological means, the agency's finding that the GTO is necessary to address money laundering and cartel activities along the southwest border should carry the day. *See* GTO Mem. at 15-17. It is in the public interest for the Government to act swiftly on these issues, particularly in light of the ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their devastating criminal activity, including, specifically, in Maricopa County. *See* GTO Mem. at 5-14, 22; Gacki Decl. ¶ 30 ("The information collected from the SW Border GTO will not only aid in disrupting this illicit flow of money by, for example, making structuring more difficult, but it will also assist Treasury and law enforcement partners in identifying and combatting cartel-related money laundering."). Given "the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border" and in Maricopa County, "FinCEN determined that the benefits of the GTO outweigh the burdens the GTO imposes on covered MSBs." Gacki Decl. ¶ 38. An injunction "would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole." *Id.* ¶ 39.

### D. The Court Should Not Hold an Evidentiary Hearing and Should Exclude Kiosko's Extra-Record, Third-Party Evidence.

Defendants respectfully suggest that there is no need for an evidentiary hearing on the preliminary injunction. There "is no presumption favoring pre-injunction hearings. *Walsh v. Ahern Rentals, Inc.*, No. 21-16124, 2022 WL 118636, at *1-2 (9th Cir. Jan. 12, 2022); *see Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 554-55 (9th Cir. 1986). Where a party seeks one, "the movant must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive." *Slide-Lok Modular Storage Sys., Inc. v. Flexmar Coatings, LLC*, No. CV 08-0279-PHX-MHM, 2008 WL 4649035, at *3 (D. Ariz. Oct. 21, 2008) (citing *Ty, Inc. v. GMA*

*Accessories, Inc.*, 132 F.3d 1167, 1171 (2d Cir. 1997)). In other words, the party seeking a hearing must show that it "intends to introduce evidence that if believed" would "affect the judge's decision on whether to issue an injunction. *Id.*

The caption of Kisko's motion indicates that it requests an evidentiary hearing. Mot. at 1. But it does not explain why one is necessary, or even what evidence it intends to present. There are no disputes of fact that need be resolved by an evidentiary hearing before the Court rules on Kiosko's motion. None of the substantive claims Kiosko presses in that motion require resolution of factual disputes; the differences between the parties are overwhelmingly legal. *See Nelson*, 799 F.2d at 555; *Walsh*, 2022 WL 118636, at *2. Indeed, each claim Kiosko presses arises under 5 U.S.C. § 706(2), the APA's provision for judicial review of final agency action. "When a plaintiff challenges a final agency action" under Section 706(2), "judicial review normally is limited to the administrative record in existence at the time of the agency's decision." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Nor does FinCEN's submission of a declaration in opposition to Kisko's preliminary-injunction motion open the door to a trial-like hearing. To facilitate judicial review, an agency may submit "affidavits or testimony" with additional explanations of the reasons for the agency decision. *See Public Power Council v. Johnson*, 674 F.2d 791, 794-95 (9th Cir. 1982) (quoting *Camp*, 411 U.S. at 143). FinCEN has done that here. But even when the agency does so, judicial review remains limited to the material it evaluated and "the reasons it considered at the time it acted." *Dombeck*, 222 F.3d at 560. Doing so does not invite a plaintiff to submit additional extra-record evidence attacking the agency's conclusions. *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986); *see Camp*, 411 U.S. at 142-43. An evidentiary hearing for Kiosko to present evidence that the agency did not consider is, therefore, impermissible.

28

To be sure, a plaintiff may submit affidavits or other evidence to meet their burden of establishing they are suffering irreparable harm necessary for a preliminary injunction to issue. *See Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017). The government does not dispute the facts Kiosko submits in the declaration of Andrea Ruiz, though it does disagree with the legal implications the Court should draw from those facts. No hearing is necessary to resolve any such disputes.

Defendants object, however, to Kiosko's submission of extra-record evidence of the effect the GTO has on third parties. *See* ECF No. 30-1 (Exhs. 2-7). Kiosko presents that evidence solely in support of its arguments (1) that it faces irreparable harm from the GTO and (2) that the GTO was arbitrary and capricious under the APA. ECF No. 30 at 7, 9, 18. Kiosko, however, cannot use Exhibits 2-7 in support of either argument.

First, Kiosko may not rely on harms to any MSB other than itself to establish irreparable harm. "The irreparable harm analysis focuses on the harm to the party seeking injunctive relief, not on potential harm to third parties." *Hernandez v. City of Phoenix*, 432 F. Supp. 3d 1049, 1068 (D. Ariz. 2020); *see also Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief.") (emphasis added); *Walsh*, 2022 WL 118636, at *2 n.2 ("The irreparable-harm analysis focuses on the moving party, not the nonmoving party or some third party."). For the same reason, Kisko's argument that the GTO causes an irreparable "loss of financial privacy" of its customers, Doc 30 at 10, is also misplaced. Second, as already explained, the APA limits review of agency action to the record before the agency—extra-record evidence is not permitted. *See Camp*, 411 U.S. at 142. Because Plaintiff's Exhibits 2-7 are impermissible, the Court should not consider them and they should be stricken from the record.

### E. Any Injunction Should Be Limited to Plaintiff.

For the reasons stated above, this Court should deny Kiosko's request for a preliminary injunction. If an injunction is issued, however, it should be limited to Kiosko. This Court recognized in its TRO that "the statewide injunction Kiosko requests is broader

29

than necessary to provide complete relief to the plaintiff before this court." Order at 10-11, ECF No. 29 (citations omitted). Granting relief of that scope therefore exceeds the limited equitable authority Congress granted in the Judiciary Act of 1789. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025). That ends the analysis.

Kiosko's arguments to the contrary do not suggest this Court should broaden its order beyond party-specific relief. Kiosko's primary argument is that the APA authorizes a final judgment vacating agency action a court finds unlawful. *See* Mot. at 21-22 (citing *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018)). Therefore, according to Kiosko at least, the APA must also authorize a universal preliminary injunction. *See id.* To the contrary, the APA's text does not indicate that it displaces the traditional equitable limitation of relief to the parties before the court. Indeed, the APA itself explains that "[n]othing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger*, 456 U.S. at 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co.*, 321 U.S. at 329.

Nor does Kiosko's brief reference to the APA's provision authorizing a court to "postpone the effective date of an agency action" compel global or statewide relief. Mot. at 22 (citing 5 U.S.C. § 705). For one thing, Kisko's motion requests "a preliminary injunction enjoining Defendants from enforcing" the GTO, not a Section 705 stay. ECF No. 31 at 1; *see* Proposed Order, ECF No. 30-2. For another, Kiosko's argument proves too much. It claims on page 22 of its brief that the APA "does not say that courts should postpone the effective date of the agency [action] for some parties." ECF No. 31 at 22. But on the immediately preceding page, it requests exactly that by asking for an injunction that

30

covers all of "Arizona" but would leave other counties within the order untouched. *Id.* at 21; *see* Proposed Order at 2 (proposing injunction that "applies to all covered businesses . . . that are located in the District of Arizona"). Kiosko does not explain how the Court could enter relief limited to Arizona's borders if it were correct that the APA requires the Court to stay the effective date of the GTO wholesale.

Regardless, nothing in 5 U.S.C. § 705 requires nationwide rather than party-specific interim relief. The statute limits its preliminary remedy to "such conditions as may be required and to the extent necessary to prevent irreparable injury" and sets out the goal of any preliminary remedy as "to preserve status and rights"—contemplating a limited remedy tailored to the injury before the court. 5 U.S.C. § 705. The text of Section 705 thus confirms courts' authority to issue traditional equitable relief pending judicial review; it does not authorize a global vacatur of agency action—a remedy far exceeding the traditional forms of equitable relief authorized in Section 703, which sets out the remedies of the APA. *See United States v. Texas*, 599 U.S. 670, 700 (2023) (Gorsuch, J., concurring) (explaining that it is not clear that Section 705 authorizes remedies at all, rather "it might just confirm courts' authority to issue traditional equitable relief pending judicial review"); *cf. Sampson v. Murray*, 415 U.S. 61, 69, n. 15 (1974) (explaining that Section 705 was "primarily intended to reflect existing law"). The legislative history of the APA too confirms that Section 705 is based on traditional equitable principles of party-specific rather than universal relief. *See Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) (House report explaining that under this provision "[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy" and that "[s]uch relief would normally, if not always, be limited to the parties complainant and may be withheld in the absence of a substantial question for review"); *id.* at 213 (Senate report stating that "[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy").

The Ninth Circuit has not yet resolved, post-*CASA*, whether APA relief *must* be

31

26-cv-02389-KML

party-limited. *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026). But even assuming the APA authorizes a court to issue an injunction that extends beyond the specific plaintiff, the Court should nevertheless exercise its discretion not to grant such widespread relief. *See Massachusetts v. Dep't of Educ.*, C.A. No. 26-11229-FDS, 2026 WL 1114877, at *13 (D. Mass. Apr. 24, 2026) (holding that the APA confers authority to grant nationwide relief but limiting injunction to specific parties before the Court). Indeed, the Ninth Circuit "has held that *CASA*'s 'complete-relief principle for crafting injunctive relief provides some useful guidance for crafting interim equitable relief' under § 705." *Pablo Sequen v. Albarran*, 814 F. Supp. 3d 1005, 1042 (N.D. Cal. 2025) (quoting *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025)). "As a result, a nationwide § 705 stay is appropriate only where a narrower stay would not remediate the irreparable harm to plaintiffs or 'is not a workable solution under the [applicable] statute.'" *Id.* (alteration in original) (quoting *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir. 2025)). And this Court has already determined Kiosko-specific relief is workable here. Because an injunction *can* be limited to prevent irreparable harm on the only party here, any equitable relief *should* be so limited.

## F. Plaintiff Should be Required to Post a Bond.

Under Federal Rule of Civil Procedure 65(c), the Court may issue such relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). Although Defendants acknowledge that the Court declined to require a bond in its TRO, Defendants respectfully request that the Court require Kiosko to post an appropriate bond should the Court issue a preliminary injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## V.    CONCLUSION

For these reasons, the Court should deny Plaintiff's motion.

DATED:  May 22, 2026                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

STEPHEN M. ELLIOTT
Assistant Branch Director

*/s/ Ryan M. Underwood*
JACOB S. SILER
RYAN M. UNDERWOOD
Trial Attorneys

*Attorneys for Defendant*
United States of America