Jose A. Saldivar #022991
Maria David # 036176
**Saldivar & Associates, PLLC**
2417 N. 24th Street
PHOENIX, ARIZONA 85008
602-314-1340 telephone
602-354-3098 facsimile
jose@saldivarlaw.com
maria@saldivarlaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Kiosko Multiservicios LLC;<br><br>    Plaintiff,<br><br>vs.<br><br>Financial Crimes Enforcement Network; Andrea Gacki, in her official capacity as Director of Financial Crimes Enforcement Network; U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; and Todd Blanche, in his official capacity as the Acting Attorney General of the United States,<br><br>    Defendants. | No. 2:26-cv-02389-KML<br><br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INNUNCTION** |

## I. Introduction

This is not a case about whether Mexican drug cartels, fentanyl, or money laundering are bad. This is a case about whether FinCEN—simply by invoking those evils—can take sudden, drastic, and devastating action against legitimate businesses without notice-and-comment rulemaking, in an arbitrary and capricious way, and without regard for Constitutional limits. The difference between the government, on the one hand,

and the cartels, fentanyl peddlers, and money launderers, on the other, is the rule of law. The government must pursue its goals lawfully and constitutionally. It has not done so. This case, then, is about government compliance with Congressional mandates and the Constitution.

The government denies the reality of what it is doing. In the face of sworn testimony by MSB owners in Maricopa County, Arizona not covered by a TRO that are incurring crippling compliance costs, the government handwaves with words like "exaggerated" or "speculative." Or it disparages MSBs like Kiosko, which is a small business with only six locations, for failing to rapidly transform into a major bank with automated filing systems. Imagine the IRS requiring taxpayers in a handful of counties to start filing weekly, not annual, tax returns on pain of fines and prison. And imagine the IRS simultaneously insisting that this could not possibly present any serious compliance burdens. That is what the government is doing here.

A preliminary injunction should be granted. The harm to Plaintiff is irreparable and Plaintiff can demonstrate both serious questions and a likelihood of success on the merits.

## II.     Argument

### A.  The GTO violates the Fourth Amendment

Plaintiff's motion explained that the GTO operates as a general warrant, allowing the government to sweep up information without individualized probable cause. FinCEN's own conception of its task confirms that this is a general warrant: to "generate new leads" and to "provid[e] FinCEN with a snapshot of a significant sample of cash transactions" of a huge swath of people in targeted counties and zip codes. ECF 24-1 at 14. This is exactly the kind of non-particularized and "unrestrained search for evidence of criminal activity" that the Fourth Amendment exists to prevent. *Riley v. California*, 573 U.S. 373, 403 (2014).

2

In response, the government argues that the GTO does not violate the Fourth Amendment because it is a reporting requirement of the sort the Supreme Court upheld in *California Bankers Ass'n v. Schultz*, 416 U.S. 21 (1974). ECF 36 at 7-8. The government argues that the rationales in *Schultz* apply to the $1,000 GTO. For example, the government quotes *Schultz* as recognizing "the heavy utilization of our domestic banking system by the minions of organized crime." *Id.* at 8 (quoting 416 U.S. at 30). And this: a reporting requirement satisfies the Fourth Amendment if the information was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce." *Id.* at 7-8 (quoting 416 U.S. at 67).

But even accepting *Schultz* as the controlling framework, it did not uphold requirements in general and does not support upholding the reporting requirement at issue here. *Schultz* upheld a $10,000 threshold in 1974—that was a lot of money then, over $60,000 today. That threshold captured only "abnormally large transactions in currency," and hence reporting was "reasonable" vis-à-vis business privacy interests because that threshold intruded on few transactions. *Schultz*, 416 U.S. at 67; *see also id.* at 78 (Powell, J., concurring) (specifically citing $10,000 threshold and stating that "[a] significant extension of the regulation's reporting requirements, however, would pose substantial and difficult constitutional questions"). By contract, FinCEN designated the $1,000 GTO (about $150 in 1974) to capture a substantial number of transactions, thus deliberately obliterating financial privacy in the targeted counties and zip codes. The motion explained that *Schulz* would have come out differently had the Supreme Court in 1974 faced a reporting threshold of $150 ($1,000 today) aimed at targeted counties and zip codes to gather evidence of crime. The government does not really respond. Instead, the government argued that entities cannot "plead an unqualified right to conduct their affairs in secret." ECF 36 at 7 (quoting *Schultz*, 416 U.S. at 65, 66-67)). But it has been long

recognized that Fourth Amendment protections extend to commercial premises. *See v. City of Seattle*, 387 U.S. 541, 542 (1967).

Plaintiff's motion also discussed *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the primary authority in *Schultz*, and highlighted its recognition that "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Id.* at 652. The $1,000 GTO is such a sweeping requirement. Yet the government does not address *Morton Salt* in its response. Nor does the government respond to Plaintiff's explanation (ECF 30 at 12) that the GTO imposes an undue burden on the targeted companies under the standard articulated by the Supreme Court for corporate subpoenas in *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984). In fact, the government does not address that case either.

The cases that the government does cite support Plaintiff. For example, the government cites *McLaughlin v. Kings Island* for the proposition that courts recognize "the permissibility of a 'warrantless inspection' in the form of 'reporting requirement[s].'" ECF 36 at 9. But the Sixth Circuit there was citing *Schultz* and *Morton Salt*, and it struck down the warrantless search for private business records there (even though the records had to be kept by law). *McLaughlin*, 849 F.2d at 995.

The motion explained that one way to conceive of the GTO is as a staggeringly overbroad subpoena for business records, and it cited the decision in *Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467 (S.D.N.Y. 2019), which applied just that reasoning and entered a preliminary injunction against a similarly broad bulk-reporting requirement targeted at short-term rental companies. The government also does not address the *Airbnb* case.

> **B. The GTO violates the APA because it is a rule, not an order, and was promulgated without the required notice-and-comment procedures.**

4

In the motion for a preliminary injunction, Plaintiff explained that the GTO is a "rule," not an "order," and hence notice-and-comment rulemaking was required. ECF 30 at 13-15. Plaintiff extensively quoted caselaw distinguishing rules and orders. The key takeaway: "Two principal characteristics distinguish rulemaking from adjudication." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Id.* "Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute)." *Id.* The GTO is a "rule" because it imposed brand-new legal obligations on unspecified individuals in targeted counties and zip codes. It obviously isn't an "order" because it is not the result of an agency proceeding adjudicating the rights of specific parties.

The government has no answer to this other than to insist that the statute, 31 U.S.C. § 5326, authorizes FinCEN to proceed by "order" and, therefore, the GTO is valid because FinCEN calls it an "order." But calling the GTO an "order" doesn't make it one. The government's reliance on *United States v. W.H. Hodges & Co.*, 533 F.2d 276, 278 (5th Cir. 1976), is misplaced. *Hodges* involved an investigative demand, made on December 1, 1972, requiring 38 market agencies to file an eight-page report for the 1972 calendar year in the course of a specific investigation arising under the Packers and Stockyards Act. *Id.* The Border GTO does not merely seek production of information already possessed by the recipient that must be submitted only once. It affirmatively requires covered entities to collect new information, maintain records, and submit numerous CTRs for transactions that occur after issuance of the GTO. Accepting FinCEN's reading would create a substantial loophole in the APA. Any agency could avoid procedural constraints by labeling a measure "investigative" even while imposing prospective compliance obligations on an entire regulated class. *Hodges* did not endorse such a proposition. The legality of the GTO must be evaluated under the specific limits

Congress placed on § 5326 authority rather than by analogy to a fifty-year-old case involving a different form of agency action under a different statute.

The government's own cases, *see* ECF 36 at 11, likewise confirm that "orders' involve individualized adjudications. *Neustar, Inc. v. FCC* was about whether the FCC needed to do notice-and-comment rulemaking to "nam[e] another company to replace Neustar" on competency grounds as the "Local Number Portability Administrator." 857 F.3d 886, 888 (D.C. Cir. 2017). *National Biodiesel Board v. EPA* involved the EPA's approval of a "comprehensive survey program" submitted by the "Argentine Chamber of Biofuels," a trade group. 843 F.3d 1010, 1014 (D.C. Cir. 2016). No rulemaking was required because both cases involved individualized adjudications about specific parties on a specific record.

### C.  5 U.S.C. § 559 Is Inapplicable.

Plaintiff addressed 5 U.S.C. § 559 in its motion because this Court required the parties to address it in the preliminary injunction briefing. However, it is not relevant to interpreting 31 U.S.C. § 5326. Because the GTO is a "rule" and not an "order," all of the constraints of the APA follow, including 5 U.S.C. § 553 which proscribes notice-and-comment procedure for rulemaking.

### D.  The GTO is Arbitrary and Capricious

In their motion, Plaintiffs walked through the holes in the FinCEN memorandum—the obvious factors that FinCEN failed to consider, most notably the destructive impact this unprecedented form of financial surveillance would have on MSBs. Image the IRS, without any input from the public, issuing an order that Americans in 12 counties and 11 zip codes must file tax returns every week instead of annually, and imagine that the order barely contemplated the burden this would impose on ordinary people. That is effectively what FinCEN has done.

The government's response willfully refuses to engage with Plaintiff's arguments. The government never addresses a critical questions. What proportion of transactions

between $1,000 and $10,000 are actually associated with illicit activity? Without that information, neither the agency nor this Court can assess whether the $1,000 threshold meaningfully targets unlawful conduct or instead sweeps in overwhelming lawful transactions.  The government also incorrectly argues that FinCEN's analysis was based on CTRs filed in the ZIP code "is high *relative to the population*, in comparison to other ZIP codes." ECF 36 at 14. But FinCEN's analysis was not considered relative to the population; it considered aggregate numbers. ECF 24-1 at 7-11, 19-24. The closest FinCEN comes is asserting, "MSBs in just 23 southwest border counties—0.7 percent of all counties—filed almost five percent of all CTRs." *Id.* at 9. But not all counties have the same population, rendering this comparison meaningless.

The government argues that it considered cartel countermeasures by monitoring shifts in activity and that it may expand or modify the GTO. But that response underscores the agency's failure rather than cures it. The APA requires reasoned decision-making before action is imposed, not a *post hoc* rationalization. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") The agency does not address the issues that Plaintiff raised—that criminals could go to neighboring states or use other money laundering techniques. And how will FinCEN know if there are shifts in activity in non-targeted counties if criminals simply structure their transactions to avoid detection as described in Andrea Gacki's declaration? ECF 38 ¶ 16. FinCEN argues it is already using the data generated by previous iterations of the GTO and making referral to law enforcement, but this is simply not evidenced in FinCEN's memorandum and Andrea Gacki's declaration. ECF 36 at 17. Notably absent is the lack of prosecutions, indictments, convictions, asset seizures, or other measurable enforcement outcomes attributable to reporting requirements. Nor does it provide any information regarding the percentage of reported transactions that were ultimately determined to involve illicit conduct.

The government once more minimizes the real burden faced by MSBs. FinCEN justifies the GTO by asserting that the reporting burden would be minimal because the "vast majority" of reports are submitted by large, sophisticated companies and that Plaintiff is part of a small minority of MSBs that file limited reports at minimal burden. ECF 36 at 18. But as demonstrated by Ms. Ruiz's affidavit, the burdens on Kiosko are anything but minimal. They are business crushing burdens that threaten Kiosko's viability, and the viability of other MSBs like Kiosko. ECF 30-1 Exhibit 1 ¶¶ 44-45; Exhibit 2-7. And FinCEN never meaningfully analyzed whether their assumption was true for the small MSBs subject to the GTO. Instead, FinCEN generalized from nationwide reporting patterns while ignoring the unique operational realities of small MSBs. The problem is compounded by FinCEN's decision to bypass notice-and-comment procedures. Had there been an opportunity for public comment, MSBs could have supplied precisely the information before the Court: that the *de minimis* burden assumption was incorrect.

### E.  The GTO is Ultra Vires

The government's attempt to insulate the Border GTO from *ultra vires* review fails on both prongs it invokes. First, the government misconstrues Plaintiff's argument that the Border GTO is a "rule" and not an "order." As explained in both the motion and in the APA notice-and-comment analysis in this Reply, it is the fact that the Border GTO imposes prospective requirements upon a large group of businesses rather than adjudicating the rights of specifically identified parties that makes the GTO a "rule." 31 U.S.C. § 5326(a) authorizes the agency to issue an "order." Congress has distinguished "rules" from "orders." 5. U.S.C. § 551(4)-(7). By choosing to use the term "order" instead of "rule" in § 5326, Congress limited the agency's authority to "orders" only. § 5326(a) states that a GTO can apply to a "domestic financial institution or nonfinancial trade or business group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." Read in conjunction with the word "order," that

language limits GTOs to *identified* businesses or business groups, not a category of businesses such as "MSBs" that apply indiscriminately to everyone. The dictionary definition the government provides for a group, "a number of individuals assembled together or having some *unifying relationship* or action," ECF 36 at 23 (emphasis added, quoting Merriam-Webster Dictionary Online), serves to confirm that Congress intended a "group of businesses" to mean something narrower than an entire regulated industry. Using the same dictionary as the government, MSBs more readily fit the definition of an "industry," which is "a distinct group of businesses that provide a particular product or service (the banking industry)." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/industry (last updated May 26, 2026). Had Congress intended for the agency to regulate an entire industry such as MSBs, it could have said so clearly by using terms such as "industry" or "category"[1] of businesses. It did not. Instead, Congress used the word "group" which requires a relationship between the businesses subject to the order. Thus, a "group" is a collection of businesses connected by a common organizational or associative relationship—such as a trade association, a chain of affiliated companies, or a parent corporation and its subsidiaries. Business group does not mean an entire industry like MSBs.

Second, as a practical matter, there is no adequate path to review. § 5326 itself provides no avenue of judicial review, and the APA's default review provisions are inadequate in practice. The Border GTO is repeatedly reissued, short in duration, and insulated from pre-enforcement challenge by its structure. Once the GTO is issued, regulated parties must either comply—incurring substantial, ongoing compliance costs without any clear vehicle for judicial review—or risk enforcement, including criminal penalties. This does not constitute a "meaningful" opportunity for review.

---

[1] A category is "any of several fundamental and distinct classes to which entities or concepts belong." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/category (last updated May 26, 2026).

The government's position, that the mere theoretical availability of APA review forecloses Plaintiff's *ultra vires* claims, cannot be reconciled with Ninth Circuit precedent. The Ninth Circuit has repeatedly allowed plaintiffs to proceed on non-statutory *ultra vires* theories even where the APA claims were also available. *Am. Fed. Of Gov't Employees v. Trump*, 139 F.4th 1020, (9th Cir. 2025); *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). Review under the APA must not only be theoretically available, but due process also requires that review be meaningful. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). APA review is limited to the administrative record, and where the record is not complete, the "requirement that the agency decision be supported by the record becomes almost meaningless." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 452 (9th Cir. 2024) (cleaned up). APA review does not provide an adequate alternative because there is an insufficient administrative record stemming from the lack of notice-and-comment rulemaking. And, unlike APA claims, *ultra vires* challenges are not limited to the administrative record. *Am. Fed. Of Gov't Employees, AFL-CIO v. Trump*, 155 F.4th 1082, 1093 (9th Cir. 2025). In this circumstances, *ultra vires* review is not displaced—it is essential.

The government's argument is circular. The agency presupposes its action must be an "order" because 31 U.S.C. § 5326(a) authorizes the agency to act by "order," while other portions of the BSA authorize action by "regulation." But just because the agency calls it an "order" does not make it one. When determining the legal significance of an agency's action, courts look to the contents of the action, not the label the agency applies to it. *Azar v. Allina Health Services*, 587 U.S. 566, 575 (2019). The difference between a rule and an order, then, is whether the proceedings were to promulgate policy-type rules or standards (a rule) or to adjudicate disputed facts in a particular case (an order). *See United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). A rule "create[s] rights, impose[s] obligations, or effect[s] a change in existing law." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087-1088 (9th Cir. 2009). This is precisely what the GTO does. It effects

a change in law by imposing new information collection, record keeping, and reporting requirements that did not previously exist. The obligations under the GTO are solely prospective and do not involve any particularized determination between identified businesses or groups of businesses. 5 U.S.C. § 551(4) (emphasis added) defines a "rule" as "the whole or part of any agency statement of general particular applicability and future effect designed to implement, interpret, or prescribe law or policy." By contrast, an "order" is "the whole or part of a final disposition…of any agency in a matter other than rulemaking…" where an "adjudication" means the "agency process for the formulation of an order." 5 U.S.C. § 551(5)-(6). As described above, *Yesler* further clarifies the distinction between a rulemaking and an adjudication. Where the formation of the GTO did not "resolve disputes among specific individuals in specific cases" as required for an adjudication, but it did "affect[] the rights of broad classes of unspecified individuals," it is clearly a "rule," not an "order." *Yesler*, 37 F.3d at 448.

The government fails to respond to Plaintiff's arguments concerning 54 Fed. Reg. 33675 (codified at 31 C.F.R. 1010.370), where the Treasury Department promulgated regulations that GTOs shall be directed to the Chief Executive Offer. The Treasury Department expected a typical GTO would cover only 250 transactions per institution per year and would be kept confidential. *Id.* at 33678. The Treasury Department's own interpretation of § 5326, contemporaneous in time with its passage by Congress, is much more constrained that the reading the government adopts now. The government provides no explanation for this apparent change.

The government misconstrues Plaintiff's arguments. Plaintiff does not argue that § 5326(a) requires notice-and-comment rulemaking for orders. The issue is that *this particular* GTO is not an "order," it is a "rule," and thus, the agency's action was *ultra vires*. The government argues the confidentiality provision under 31 U.S.C. § 5326(c) "would be entirely without force if the agency were required to conduct public notice-and-comment rulemaking." ECF 36 at 21. But FinCEN's action here of publishing the

GTO in the Federal Register renders § 5326(c) equally meaningless. FinCEN did not identify specific businesses and make confidential orders directed to Chief Executive Officers by certified or registered mail as FinCEN itself contemplated. *See* 54 Fed. Reg. at 33675-33678. FinCEN published the GTO publicly. Criminals everywhere know about the GTO and can take steps to avoid having their transactions reported such as by going to counties not covered by the GTO.

### F.  Kiosko Will Suffer Irreparable Harm

The government does not dispute that the financial harms here are irreparable because of sovereign immunity, that injuries to reputation and goodwill are irreparable, or that the loss of constitutional rights is irreparable. Rather, the government, which does not operate any MSBs, disparages the sworn harms of Plaintiff as "exaggerated" and is dismissive of the costs and time of "automated batch filing." ECF 36 at 24. But Kiosko is a small business—having only six locations—owned by Andrea Ruiz. Ms. Ruiz is the best person to testify about the immense costs of compliance, including paying for software used by institutional filers like banks. And who is the government—which deliberately manufactured the FinCEN memorandum behind closed doors to exclude unfavorable evidence—to claim that the real harms suffered in the real world by real people are imaginary? Who is the government to claim that "[n]one of these expenses appear to be so financially ruinous that they threaten the viability of Ms. Ruiz's business?" *Id.* at 25. Ms. Ruiz herself fears that she will be forced to close all but one or two of her six stores, if Kiosko does not go out of business entirely. These fears are far from speculative—Kiosko lost at least 500 customers and 20% of its transactions in the two months prior to the TRO. ECF 30-1 at ¶¶ 14, 24-25, and 44. This loss is significant and ruinous, contrary to what the government asserts. FinCEN also criticizes Kiosko's time estimates of between 10 to 18 minutes per CTR depending on the type of transaction (e.g. a CTR filed directly by Kiosko or a CTR submitted by the money transmitter but where Kiosko must still collect the information), but Kiosko's time estimates are

significantly below FinCEN's own time estimate 23.93 per transaction for a small MSB like Kiosko. 85 Fed. Reg. 29,022, 29,029 (May 4, 2020).

The government's attempt to minimize Plaintiff's injury only underscores why notice-and-comment procedures were required in the first place. As the government describes it, compliance with the GTO imposes only negligible costs because money services businesses can simply utilize batch-filing software and absorb the resulting reporting obligations with minimal effort. But that assertion rests entirely on the government's own assumptions. FinCEN never solicited comments from the small businesses now subject to the GTO, never gathered evidence regarding their compliance capabilities, and never tested whether the costs of acquiring software, modifying compliance systems, training personnel, collecting additional customer information, and filing CTRs would in fact be insignificant for smaller operators. The government's present insistence that the burdens are *de minimis* and Kiosko's harms "exaggerated" are therefore not evidence—it is a *post hoc* justification for bypassing the very procedures designed to expose such assumptions to public scrutiny.

The harms are not isolated to Kiosko. Six other small MSB owners have submitted sworn affidavits stating that they likewise face severe economic harm and potential business closure if forced to comply with the GTO. ECF 30-1 Exhibits 2-7. Had FinCEN engaged in notice-and-comment rulemaking, affected MSBs could have demonstrated that compliance costs are neither uniform nor trivial and that measures readily available to large institutions may impose substantial burdens on small businesses. The government cannot simultaneously argue that industry input was unnecessary and then rely on unsupported assumptions about industry compliance costs to defeat a showing of irreparable harm. The dispute over the magnitude of the burden is precisely the type of issue that an evidentiary hearing is required to address.

### G. The Balance of Equities and Public Interest Favor Plaintiff.

13

The government invokes a generalized interest in national security and money laundering threats. ECF 36 at 27. There is undoubtedly a public interest in effective law enforcement, yet the government must accomplish its objectives using lawful means. There is an equally compelling public interest in ensuring that agencies act within the limits imposed by Congress and the Constitution. The government is not harmed by an injunction that merely ends an unlawful practice. But Kiosko will likely close all but one or two stores or go out of business entirely without an injunction. Neither the seriousness of the government's goals nor the desirability of the policy can authorize action that Congress has not permitted. As described above, because FinCEN violated the APA and exceeded the authority granted by § 5326(a), then the public interest is served by enjoining the unlawful order and requiring the agency to proceed through lawful means. The government has a legitimate interest in combatting fentanyl trafficking and money laundering. It has no legitimate interest in doing so through actions that violate federal law and infringe on Fourth Amendment constitutional rights.

## H. The Court Should Hold an Evidentiary Hearing and Should Consider The Affidavits Provided by Kiosko

While many of the issues at play are largely legal, the irreparable harm to Kiosko is not. Where, as here, "sharply disputed facts are simple and little time would be required for an evidentiary hearing, proceeding on affidavits alone might be inappropriate." *Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986). The government claims that it does not dispute the facts in Ms. Ruiz's affidavit, but that is not how the response reads, such as by suggesting that Kiosko could minimize burdens by using automated batch-filing. That contention directly contradicts Ms. Ruiz's affidavit regarding the cost, feasibility, and operational impact of compliance, finding software would not materially eliminate the burden due to expensive hardware costing Kiosko $11,200, data collection time for new customers, and additional personnel requirements even with software. ECF 30-1 Exhibit 1 ¶¶ 38-40. The

government also disputes Ms. Ruiz's time estimates to meet the reporting requirements, asserting they are "inconsistent with real-world averages." ECF 36 at 25. Ms. Herrera, who is the owner of a six location MSB in Phoenix, Arizona, provided an affidavit which is useful on that issue, as she can corroborate Ms. Ruiz's time estimates because Ms. Herrera estimates it takes her business 10 minutes per report (ECF 30-1 at Exhibit 2).

The government similarly disputes the loss of goodwill, arguing that Plaintiff has "failed to explain why its goodwill would be harmed." ECF 36 at 25. But Plaintiff submitted a sworn declaration explaining that compliance has already damaged customer relationships and caused loss of customers. ECF 30-1 Exhibit 1 ¶¶ 24-26. That disagreement presents a quintessential factual dispute. Whether customers have altered their behavior, expressed dissatisfaction, taken their business elsewhere, or become reluctant to engage in transactions because of the GTO are factual matters best explored through witness testimony. Courts have long recognized that injuries to goodwill and customer relationships are inherently difficult to quantify and frequently constitute irreparable harm. *See American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). Ms. Ruiz can testify about the lost goodwill. In addition, the six MSB owners who provided affidavits (ECF 30-1 Exhibits 2-7) all indicated a loss of goodwill to their businesses. Their testimony would permit the Court to evaluate whether the loss of goodwill is isolated to Kiosko or reflects a broader pattern affecting small MSBs subject to the GTO. The affidavits from multiple independent business owners are particularly significant because they corroborate one another, and demonstrate that Kiosko's injuries are neither speculative not isolated to Kiosko. The government cannot simultaneously dispute Kiosko's factual showing of irreparable harm and then argue that no hearing is necessary.

Confining review to the administrative record is contrary to existing law. As noted above, *ultra vires* review is not confined to the administrative record. *Am. Fed. Of Gov't Employees*, 155 F.4th at 1093. For claims brought under the APA, extra-record materials

can be considered when those materials point to issues that an agency failed to consider. *See National Audubon Soc. v. U.S. Forest Service*, 46 F.3d 1437, 1447 (9th Cir. 1993) ("the district court may extend its review beyond the administrative record …where the plaintiff alleges that that an EIS has neglected to mention a serious environmental consequence, failed to adequately discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug") (cleaned up). The court can also consider extra-record evidence when "procedural irregularities prevented the full development of the administrative record." *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1028 (9th Cir. 2008). And, where the government ignores "settled principles" such as the "compilation of a conventional administrative record, no notice-and-comment rulemaking, and no issuance of a final rule or adjudication," review need not be confined to the record. *See Am. Fed. Of Gov't. Employees,* 155 F.4th at 1093 (finding "massive RIFs and reorganizations have been carried out without anything resembling the normal rulemaking or adjudicatory processes that typically produce a conventional administrative record"); *see also Nat'l Ass'n of Gun Rights, Inc. v. Garland*, 741 F.Supp.3d 568 (N.D. Tex. 2024) (consideration of extra-record materials is appropriate where there was "no public comment period during which Plaintiffs, or anyone else, could weight in and correct errors in the agency's administrative process").

This is the exact circumstance here. FinCEN issued the GTO with broad and crushing effect without notice-and-comment and without any consideration for the impact on affected MSBs. In its memorandum, the government handwaves the burden on MSBs by claiming they are *de minimis* (while simultaneously acknowledging that it has limited information on how some MSBs have been impacted). ECF 24-1 at 25. That contention is meaningless without input from the affected MSBs themselves. The fact that this is the fourth case in three states about the GTO under its three iterations shows that the harm is not *de minimis*. Moreover, the government has not submitted an administrative record, despite citing to one in Andrea Gacki's declaration. ECF 38 at ¶¶ 21, 33. There is, simply

put, no administrative record to review as FinCEN has not provided one. FinCEN has only provided the memorandum and declaration cherrypicked by FinCEN. This Court should consider the affidavits of the MSB owners and their testimony at an evidentiary hearing.

### I. The Injunction Should Apply Throughout Arizona and Kiosko Should Not Be required to Post Bond

In their motion, Plaintiffs reiterated the familiar principal that no separate analysis is required for the public interest and balance of equities. "Plaintiffs who are able to establish a likelihood that a policy violates the U.S. Constitution have also established that both the public and private interest and the balance of the equities favor a preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (cleaned up). Furthermore, there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The government has no serious response to this. Instead, it argues the "scope…exceeds the limited equitably authority Congress granted in the Judiciary Act of 1789." ECF 36 at 30 (*citing Trump v. Casa, Inc.*, 606 U.S. 831, 851-852 (2025). But this case arises under the APA, and *CASA* explicitly stated that "nothing we way today resolves the distinct question of whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. *See* 5 U.S.C. § 706(2)." *Id.* at 847 n. 10. 5 U.S.C. § 705 authorizes the court to postpone the effective date. The Ninth Circuit addressed the issue in *Nat'l TPS All. v. Noem*, 169 F.4th 796, 799 (9th Cir. 2026), finding that *CASA* did not change decades long precedent allowing set aside relief under the APA. Other courts have held the same. *See Doe v. Trump*, 157 F.4th 36, 80-81 (1st Cir. 2025) ("Nothing in *CASA* provides that, as a categorical matter, it is improper for a district court to impose an injunction of such breadth if it is necessary to do so to provide the plaintiff with complete relief."); *Make the Road New York v. Noem*, No.25-5320,

17

2025 WL 3563313 at *34 (D.C. Cir. 2025) ("*CASA* does not control the scope of relief available under Section 705.")

Limiting relief to Kiosko would leave the challenged GTO in force against identically situated MSBs, distort competition, and fail to eliminate the very compliance burdens that form the basis of Kiosko's irreparable injury. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018).

Thus, Plaintiff asks the Court to vacate the GTO. No bond should be required because there is a public-interest motivation behind the litigation.

### III.    Conclusion

For the reasons set forth above, Plaintiff respectfully requests the Court enter a preliminary injunction.

RESPECTFULLY SUBMITTED this 27th day of May, 2026.

**Saldivar & Associates, PLLC**

*/s/Maria David*
Jose A. Saldivar, Esq.
Maria David, Esq.
Saldivar & Associates, PLLC
2417 N. 24th St.
Phoenix, AZ 85008
jose@saldivarlaw.com
maria@saldivarlaw.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 27, 2026, I electronically transmitted the attached document to the Clerk's office using the CM/ECF system, which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


*/s/Maria David*